CHANDLER, J.,
for the Court.
¶ 1. Judy R. Tolhson suffered an admittedly work-related shoulder injury during the course and scope of her employment with Lifestyle Furnishings (Lifestyle). At issue in this appeal is the degree of permanent disability attributable to her injury. An administrative law judge determined that Tollison was permanently, totally disabled. The Mississippi Workers’ Compensation Commission reversed this determination and awarded permanent partial disability benefits for Tolli-son’s total loss of use of her arm. The Circuit Court of Lee County reversed and reinstated the order of the administrative law judge. Lifestyle and its insurance carrier appeal.
¶ 2. We find that the decision of the Commission was supported by substantial evidence and was not arbitrary and capricious. Therefore, we reverse the judgment of the circuit court and reinstate the decision of the Commission.
FACTS
¶ 3. Tollison began working for Lifestyle on November 16, 1996. She worked on an assembly line upholstering the outside arms of sofas, love seats, and recliners. The job required Tollison to use both of her arms to lift the pieces of furniture. In January 2001, Tollison was performing this work when she experienced pain in her left shoulder. Tollison initially saw Dr. Walter Eckman. He ordered an MRI, which revealed a rotator cuff tear. On June 14, 2001, Dr. Kim Stimpson performed surgery for the rotator cuff tear. According to Dr. Stimpson’s office notes, after the surgery Tollison had problems with stiffness and shoulder pain. On November 13, 2001, Dr. Stimpson performed a second shoulder surgery. Tollison initially improved after this procedure, but later she developed a chronically painful, dysfunctional shoulder. Dr. Stimpson referred Tollison to Dr. George Hammitt for pain management. In a May 31, 2002, office note, Dr. Stimpson “recommended that she be made [maximum medical improvement] at this time,” but Dr. Stimpson deferred an impairment rating until after an MRI and a functional capacity evaluation (FCE) were accomplished.
¶4. Tollison testified that, in February 2003, she returned to Lifestyle and resumed her former job. However, Tollison *356 was unable to perform the job due to pain in her left arm, and a manager sent her home at noon. In a March 10, 2003, letter, Dr. Stimpson opined that Tollison had reached maximum medical improvement (MMI) and gave Tollison a fifty percent impairment rating to the left upper extremity and a thirty percent impairment rating to the whole person. Concerning Tollison’s physical condition, Dr. Stimpson stated:
Based upon my physical evaluation and the history of Mrs. Tollison’s problem my impression is that she has almost a completely dysfunctional left upper extremity secondary to muscle weakness and pain. Even though she does have a full range of motion this essentially not useful [sic] as she is unable to sustain any motor activity repetitively throughout her range of motion on a regular basis.
¶ 5. Dr. Hammitt diagnosed Tollison with chronic regional pain syndrome (CRPS), a disorder of the sympathetic nervous system formerly known as reflex sympathetic dystrophy. Dr. Hammitt testified in his deposition that CRPS is a disease which causes an affected limb to have skin changes, nail bed changes, loss of hair, coldness, swelling, and sweating. He treated Tollison with injections and daily medications, including a muscle relaxer, pain medication, and Neurontin. In his deposition, Dr. Hammitt indicated that these medications caused drowsiness and dizziness and that Tollison should not do work requiring driving or operating machinery. He stated that, due to the medications, Tollison could have difficulty doing work requiring concentration, such as accounting. He stated that Tollison could drive to and from a job. Dr. Hammitt opined that Tollison’s condition was permanent.
¶ 6. At the request of Lifestyle, Tollison saw Dr. Cooper L. Terry on September 11, 2003. Dr. Terry reviewed Tollison’s medical records and the results of the FCE that was performed in June 2002.[1] Dr. Terry concluded that Tollison had developed a pain syndrome consistent with reflex sympathetic dystrophy and that she would possibly need further treatment by a pain specialist. He agreed with Dr. Stimpson that Tollison had reached maximum medical improvement on March 10, 2003. Dr. Terry concluded from his findings that the FCE was not valid. Dr. Terry opined that Tollison had a forty-five percent impairment of the left upper extremity and a seventeen percent impairment to the body as a whole. He believed she was restricted to sedentary work with no lifting, pushing, or pulling with the left upper extremity.
¶ 7. Tollison testified that she experiences pain while lifting her left, non-dominant arm and that she can lift only very light objects. She stated that the pain extends from her neck to her fingertips. Tollison testified that she also experiences swelling and coldness in her injured arm. Tollison testified that her medications make her dizzy and nauseated and interfere with her ability to concentrate. She stated that she does not enjoy being unable to work.
¶ 8. Tollison was forty-one years old at the time of the hearing before the administrative law judge on February 6, 2004. She was a lifelong resident of Guntown, Mississippi. She testified that she graduated from high school and had one year of *357 college in a pre-nursing program. During high school, Tollison worked as a waitress. After leaving college, her primary employment was assembly line work in manufacturing plants, including furniture manufacturers and a glass company. For one year, she worked as a sewing machine operator and presser at a blue jeans factory. She also spent three years as a customer service representative in a store that sold jewelry and household items. This job required Tollison to deal with customers, supervise several cashiers, bag items, and use the computer.
¶ 9. Lifestyle hired Bruce Brawner, a vocational rehabilitation specialist, to assess Tollison’s employability. Brawner located twenty job openings in Tollison’s area that he testified were within Tolli-son’s work restrictions. The job titles included customer service representative, insurance clerk, cashier, mail clerk, inside sales representative, dentist’s office facilitator, counter clerk, inventory management associate, distribution clerk, collector, and management trainee. Brawner communicated these job openings to Tolli-son during a period from October 2003 through January 2004. Tollison testified that, beginning on October 21, 2003, she applied for every job. located by Brawner, but she was not offered a position. Brawn-er testified that, when he followed up with each employer, four of the employers denied that Tollison had contacted them. Several other employers did not verify whether or not Tollison had applied. Brawner testified that, in his opinion, Tolli-son was a good candidate for employment given her relatively young age, her education, her work experience, her work restrictions, and the type of work available in her area.
¶ 10. Tollison testified that she did not begin her job search in earnest until October 2003 because, until that time, she still considered herself to be employed with Lifestyle. Tollison stated her belief was based upon occasional telephone communication with her supervisor and her receipt of cards and a Thanksgiving turkey from Lifestyle. However, Tollison also testified that, prior to October 2003, she had inquired about work at two local grocery stores, a convenience store, and a flower store.
¶ 11. On December 8, 2003, Tollison filed a supplemental interrogatory response listing thirty-two employers fhat she contacted for work. The response included twenty employers in nearby Tupelo that Tollison located herself by stopping in and inquiring whether the employer was hiring. She performed the first of these inquiries on November 7, 2003. These employers included West Heights Florists, Maloney Glass, Village Green, Village Frames, Jimmy Langley Realty, Jerry Bristow Appraisal, Weatherall’s, Tupelo Small Animal Hospital, Creative Cakes, Lifeway Christian Bookstore, Jody’s Flowers and Gifts, Shoot to Finish, Karmel-korn, Sports Country, Room to Room, Swimming Pools of Tupelo, Tupelo Park and Recreation, Prestige Pool, and Mattress Express. However, when Lifestyle followed up with these employers, four denied ever having had contact with Tolli-son. Of those four employers, Tollison sent her resume by certified mail to only two.
¶ 12. The administrative law judge found that Tollison was entitled to permanent disability benefits for the total occupational loss of use of her left upper extremity. The administrative law judge further found that Tollison had met the burden of proof for permanent, total disability by establishing a total loss of wage-earning capacity. The administrative law judge based this conclusion upon the finding that Lifestyle had failed to rebut the *358 presumption of total disability created by Tollison’s inability to find work after a reasonable job search, and that Lifestyle had failed to offer Tollison work within her restrictions after she reported back to work at Lifestyle. Notably, the administrative law judge found that the appropriate date of MMI was March 10, 2003.
¶ 13. Lifestyle petitioned for review by the full Commission. The Commission found from its review of the record that Tollison did not prove a total loss of wage-earning capacity because she had not conducted a reasonable job search. The Commission found that Tollison could no longer perform her pre-injury employment, but it questioned the diligence of Tollison’s efforts to find alternate work. The Commission observed that, after reaching MMI on March 10, 2003, Tollison delayed seven months before beginning her job search, and her job search was a “quick, unsus-tained effort in the months leading up to the hearing.” The Commission stated, “we have reservations concerning the efforts employed by Ms. Tollison to find suitable work and, like Mr. Brawner, we seriously question whether she is in fact permanently and totally disabled.” The Commission reversed the decision of the administrative law judge and awarded permanent partial disability benefits for the total loss of use of the left upper extremity-
¶ 14. The circuit court reversed the Commission’s decision and reinstated the decision of the administrative law judge. We find that the Commission’s decision was supported by substantial evidence and that the circuit court erred by re-weighing the evidence before the Commission. Therefore, we reverse and reinstate the decision of the Commission.
STANDARD OF REVIEW
¶ 15. This Court applies a limited standard of review to the decisions of the Commission. Raytheon Aerospace Support Servs. v. Miller, 861 So.2d 330, 335, (¶ 9) (Miss.2003). By statute, the Commission sits as the finder of fact. Id. at (¶ 11). Therefore, it is the decision of the Commission, not that of the administrative law judge, which is entitled to deference on appeal. Smith v. Jackson Constr. Co., 607 So.2d 1119, 1123-24 (Miss.1992). The circuit court performs an appellate function and must employ the same deferential standard of review used by this Court. Id.
¶ 16. Under our standard of review, we may not reverse the Commission’s decision unless its findings were unsupported by substantial evidence and were arbitrary and capricious. Ga. Pac. Corp. v. Taplin, 586 So.2d 823, 826 (Miss.1991). We review the Commission’s application of the law de novo. ABC Mfg. Corp. v. Doyle, 749 So.2d 43, 45(¶ 10) (Miss.1999). The legal effect of the evidence and the conclusions which the Commission has drawn therefrom present questions of law. Cent. Elec. Power Ass’n v. Hicks, 236 Miss. 378, 388-89, 110 So.2d 351, 356 (1959).
¶ 17. A reviewing court commits error if it simply re-weighs the evidence and substitutes its judgment for that of the Commission. Raytheon, 861 So.2d at 335(¶ 11) (quoting Natchez Equip. Co. v. Gibbs, 623 So.2d 270, 274 (Miss.1993)). “[I]t is not the role of the [reviewing] court to determine where the preponderance of evidence lies, when the evidence is conflicting, given that it is presumed that the Commission as trier of fact has previously determined which evidence is credible and which evidence is not.” Hale v. Ruleville Health Care Ctr., 687 So.2d 1221, 1224-25 (Miss.1997). A Commission decision that is supported by substantial evidence may not be overturned even if, were this Court acting as the fact-finder, we would have *359 reached the opposite conclusion. Vance v. Twin River Homes, Inc., 641 So.2d 1176, 1180 (Miss.1994).
LAW AND ANALYSIS
DID THE CIRCUIT COURT ERR BY FINDING THAT THE COMMISSION’S DECISION WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND WAS ARBITRARY AND CAPRICIOUS?
¶ 18. “ ‘Disability’ means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.” Miss.Code Ann. § 71-3-3(i) (Rev. 2000). This definition refers to an occupational disability rather than to a medical disability. Marshall Durbin, Inc. v. Hall, 490 So.2d 877, 880 (Miss.1986). A worker injured in the course and scope of her employment is entitled to compensation “to the extent that [s]he has been incapacitated to earn wages.” Id. Benefits for the claimant’s permanent, total loss of wage-earning capacity are available under section 71-3-17(a) (Rev.2000); benefits for permanent partial disability are governed by section 71-3-17(c) (Rev.2000).
¶ 19. Notwithstanding the focus of the Mississippi Workers’ Compensation Act upon the claimant’s loss of wage-earning capacity, the Act arbitrarily schedules compensation for loss or loss of use of certain listed members based upon the claimant’s functional loss regardless of lost wage-earning capacity. Smith, 607 So.2d at 1126.[2] However, in Smith, the supreme court held that:
Where an employee suffers an injury covered by the schedule in Section 71-3-
17(c) and where that injury results in a permanent loss of wage[-]earning capacity within Section 71-3-17(a), the latter section controls exclusively and the employee is not limited to the number of weeks of compensation prescribed in Section 71-3-17(c)’s schedule.
Id. at 1128. Therefore, “[i]f a claimant is unable to earn wages despite only a loss or loss of use of a scheduled member, then the claimant is permanently and totally disabled.” Id.
¶20. The Commission determined that Tollison sustained an injury that permanently, totally prevents her occupational use of her arm, a scheduled member. Miss.Code Ann. § 71-3-17(c)(1). Accordingly, the Commission awarded Tollison two hundred weeks of permanent partial disability benefits for the total loss of use of her arm. Miss.Code Ann. § 71-3-17(c)(22). Lifestyle does not contest that award on appeal. Lifestyle’s argument is that the Commission was supported by substantial evidence in rejecting Tollison’s claim that she was permanently, totally disabled.
¶ 21. The claimant has the burden of proving disability and the extent thereof. Am. Potash & Chem. Corp. v. Rea, 228 So.2d 867, 868 (Miss.1969). The order of proof is subject to a burden-shifting scheme. Hale, 687 So.2d at 1226. The claimant must make a prima facie showing that she has been unable to find work in the “same or other employment.” Id. (quoting Miss.Code Ann. § 71-3-3(i). A claimant makes a prima facie case of total disability by showing reasonable efforts to find other employment. Thompson v. Wells-Lamont Corp., 362 So.2d 638, 641 (Miss.1978). The claimant can also *360 establish a prima facie case of total disability if the claimant, after reaching MMI, reports back to the employer for work and the employer refuses to reinstate or rehire her. Hale, 687 So.2d at 1226 (citing Jordan v. Hercules, Inc., 600 So.2d 179, 183 (Miss.1992)). These two methods of making a prima facie case have been deemed the Jordan/Thompson test. Id. at 1227-28.
¶ 22. Once the claimant establishes a prima facie case, then the burden shifts to the employer to rebut the presumption of total disability by showing that the claimant only suffered a partial disability or no loss of wage-earning capacity. Id. “[T]he employer may present evidence (if any) showing that the claimant’s efforts to obtain other employment were a mere sham, or less than reasonable, or without proper diligence.” Thompson, 362 So.2d at 641. The employer may accomplish this by setting forth facts showing that suitable work was available to the claimant. Id.
¶ 23. The Commission found that no presumption of a total loss of wage-earning capacity arose from the evidence surrounding Tollison’s claim. The circuit court found that the Commission’s conclusion was arbitrary and capricious because Tolli-son had established a prima facie case of total disability under both Jordan and Thompson that was unrebutted by Lifestyle. We review the Commission’s findings regarding Tollison’s establishment of a prima facie case.
’ ¶ 24. The Commission correctly found that Tollison had not established a prima facie case under Jordan. Tollison reported back to work at Lifestyle, but she was unable to perform her former job. Lifestyle did not provide Tollison with work within her restrictions. The circuit court concluded from these facts that Tollison had established a prima facie case under Jordan. However, to establish a prima facie case under Jordan, the claimant must report back to work after reaching MMI. Mueller Copper Tube Co. v. Upton, 930 So.2d 428, 435(¶ 27) (Miss.Ct.App.2005). Tollison reported back to work in February 2003 before she reached MMI on March 10, 2003. Therefore, even assuming the evidence otherwise supported the application of the Jordan presumption, Tollison did not establish a prima facie case of total disability under Jordan.
¶ 25. We now turn to the Commission’s assessment of Tollison’s job search. The Commission must evaluate the extent of any disability by considering the evidence as a whole. McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 167 (Miss.1991). A claimant is totally disabled if she is disqualified for regular employment in the labor market. Roling v. Hatten & Davis Lumber Co., 226 Miss. 732, 741, 85 So.2d 486, 489 (1956). Factors which should be considered in determining loss of wage-earning capacity “include the amount of education and training which the claimant has had, his inability to work, his failure to be hired elsewhere, the continuance of pain, and any other related circumstances.” McGowan, 586 So.2d at 167. In assessing the reasonableness of a claimant’s job search, relevant factors for consideration are: “the economic and industrial aspects of the local community, the jobs available in the community and surrounding area, the claimant’s general educational background, including work skills, and the particular nature of the disability for which compensation is sought.” Thompson, 362 So.2d at 641.
¶26. The Commission found from the evidence that Tollison could not resume work in her pre-injury employment, but she had made insufficient efforts to obtain “other employment,” that is, “employment *361 in another or different trade for which she might be suited.” Sardis Luggage Co. v. Wilson, 374 So.2d 826, 828 (Miss.1979). The Commission found that Tollison’s search for other employment was not reasonable because: (1) Tollison delayed her job search for seven months after reaching MMI; (2) her job search was a “quick, unsustained effort in the months leading up to the hearing;”[3] (3) several employers disputed that Tollison applied for work; (4) Tollison made no effort to determine whether the jobs she located were within her work restrictions; (5) Brawner testified that Tollison remained employable in a number of jobs in the geographic area given her relatively young age, her work restrictions, her education level, and her work history in jobs other than assembly line work; and (6) Brawner’s opinion that, with the proper effort, Tollison is capable of securing gainful employment.
¶ 27. The circuit court found that the Commission’s decision was arbitrary and capricious because the uncontradicted facts in the record established that Tollison’s job search was reasonable; thus, she made a prima facie case of total disability. In so holding, the circuit court relied upon this Court’s holding in Merit Distribution Services, Inc. v. Hudson, 883 So.2d 134, 137(117) (Miss.2004), which affirmed the Commission’s finding that the claimant had completed a reasonable job search by applying to five potential employers. The circuit court held that the evidence presented by Lifestyle did not rebut Tollison’s prima facie case of total disability because Tollison was not offered any of the twenty jobs located by Brawner.
¶28. We find that the decision of the circuit court re-weighed the evidence and invaded the decision-making authority of the Commission. The facts and conclusions cited by the Commission and enumerated above had substantial support in the record. The Commission considered the evidence as a whole and found that no presumption of permanent, total disability arose because Tollison had failed to make reasonable efforts to find other employment.
¶ 29. The supreme court has recognized that determining the reasonableness of a claimant’s job search is a fact-intensive process that is not amenable to the application of a precise formula. Thompson, 362 So.2d at 641. There, the court stated: “What constitutes a reasonable effort to obtain employment is a matter not of easy definition, and what might be a reasonable effort in one situation might not be so in another.” Id. There is no particular number of jobs the claimant must apply for to establish a reasonable job search. Rather, the question of whether a claimant’s job search was reasonable is determinable with reference to the factors enumerated in Thompson. Moreover, the Commission is charged with weighing the evidence and judging the credibility of the witnesses. Sibley v. Unifirst Bank for Sav., 699 So.2d 1214, 1219(¶ 24) (Miss.1997). It is proper for the Commission to consider the claimant’s diligence in its efforts to determine the extent of the claimant’s permanent disability. Moore v. Indep. Life & Accident Ins. Co., 788 So.2d 106, 115(¶ 34) (Miss.Ct.App.2001). Additionally, the claimant’s commencement of his job search one month before the hearing has been found to support the Commission’s finding that the job search was not reasonable. Hale, 687 So.2d at 1227.
*362 ¶ 80. Applying these principles in Merit, this Court affirmed the Commission’s finding that the claimant’s efforts to find other employment, consisting of applying for work at five companies, was reasonable. Merit, 883 So.2d at 137(¶ 7). But rather than establishing a threshold for a reasonable job search, our finding was that, given the conflicting evidence before the Commission, the Commission’s decision that the job search was reasonable was supported by substantial evidence. Id. We held that the evidence substantially supported the Commission’s conclusion such that the conclusion was a legitimate exercise of the Commission’s decision-making authority. We did not hold that the Commission was required, as a matter of law, to find that the claimant’s application for work at five companies was a reasonable job search.
¶ 31. In this case, the Commission concluded that Tollison’s job search was not reasonable, considering: (1) Tollison’s relatively young age; (2) her total occupational loss of her non-dominant arm; (3) her work restrictions; (4) the availability of work within the community; (5) Brawner’s opinion that Tollison was employable; (6) the extent of Tollison’s own job search, in which she made inquiries indiscriminately in the months before the hearing; and (7) other factors. It appears that the Commission was convinced that Tollison’s job search was insufficiently diligent to establish a total loss of wage-earning capacity given her age, work restrictions, education, skills, work experience, and the availability of employment in her geographic area. This finding was supported by the substantial evidence cited by the Commission in support of its decision. Thus, the decision was within the Commission’s authority to make, and it is beyond the power of this Court to disturb. The circuit court erred by re-weighing the evidence before the Commission concerning the reasonableness of Tollison’s job search. We reverse the judgment of the circuit court and reinstate the Commission’s decision.
¶ 32. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY IS REVERSED AND JUDGMENT RENDERED TO REINSTATE THE ORDER OF THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.

. The FCE was not made a part of the record before the Commission. However, a letter from Bruce Brawner, a vocational rehabilitation specialist hired by Lifestyle to assess Tol-lison's employability, states that the FCE indicated that Tollison was capable of performing at the medium level.

. "However, in some cases, despite a partial functional loss of a scheduled member, the claimant’s industrial or occupational disability or loss of wage-earning capacity controls his degree of disability." Smith, 607 So.2d at 1126.

. As Lifestyle points out, the record reflects that the hearing was originally scheduled for December 5, 2003, only weeks after Tollison commenced her own job search on November 7, 2003.