# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-WC-01095-COA

**RDJJ SERVICES INC. AND ACCIDENT FUND**          **APPELLANTS**
**GENERAL INSURANCE COMPANY**

**v.**

**MARGARITO RIVERA**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/02/2020 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEYS FOR APPELLANTS: | P. SHARKEY BURKE<br>BRADLEY ALLEN SHAW |
| ATTORNEYS FOR APPELLEE: | JAMES KENNETH WETZEL<br>GARNER JAMES WETZEL |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 06/08/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.

### SMITH, J., FOR THE COURT:

¶1. RDJJ Services Inc. (RDJJ) and its insurance carrier, Accident Fund General Insurance Company (Accident Fund), appeal the Mississippi Workers' Compensation Commission's (Commission) order finding that Margarito Rivera suffered a 100% industrial loss of use of his left upper extremity and awarding permanent partial disability benefits to Rivera.

¶2. On appeal, RDJJ argues the Commission erred by (1) finding a 100% industrial loss of use when the medical evidence showed that Rivera was capable of returning to heavy duty work but for his status as an undocumented immigrant, and (2) denying RDJJ and Accident Fund's motion in limine to exclude Rivera's job search. After review, we find no error and

affirm the Commission's order.

**FACTS AND PROCEDURAL HISTORY**

¶3. Rivera came to Mississippi in 2002 when he was hired by RDJJ as a "chicken catcher" and remained employed in this position for the same company from 2002 until 2016. Rivera's job as a "chicken catcher" consisted of catching chickens by hand and throwing them into a box. Rivera picked up six to eight chickens at a time and caught between 48,000 and 50,000 chickens per week. Rivera's uncontradicted testimony was that RDJJ paid him weekly, initially in cash but then later by check, based on the quantity of chickens he caught that week and did not take out taxes or other withholdings to his knowledge. Rivera also testified that when he was hired, the employer gave him a Social Security number to use when he was working for them.

¶4. On September 1, 2016, Rivera suffered injuries to his left shoulder and arm while he was grabbing and throwing chickens as part of his job for RDJJ. After learning of Rivera's arm pain, RDJJ instructed him to go to STATCare, an emergency clinic. Dr. Andrew Watson performed x-rays, prescribed physical therapy, ordered an MRI, and referred Rivera to an orthopaedic surgeon. Rivera then presented to Dr. Lawrence Line at Southern Bone & Joint, where he was diagnosed with various left upper extremity ailments and underwent three different surgeries between November 2016 and August 2017. At Dr. Line's instruction, Rivera simultaneously went to physical therapy as well. Dr. Line ordered an updated MRI and an EMG/nerve study after Rivera continued to experience pain in his left shoulder and

2

arm, but neither test provided an explanation for Rivera's pain. Rivera presented to Dr. James Hurt on January 23, 2018, for a second opinion. Dr. Hurt stated that Rivera had passive range of motion, physical therapy was not necessary, injections were not warranted, and Rivera's condition was not surgical.

¶5.　On April 3, 2018, Rivera underwent a functional capacity examination (FCE) to determine his ability to perform specific tasks related to his job. Based on this FCE, Dr. Line placed Rivera at maximum medical improvement (MMI) on May 7, 2018, with an 18% upper extremity impairment and sedentary restrictions. Rivera then presented to Dr. George Salloum at Bienville Orthopaedics for an additional medical opinion. Dr. Salloum diagnosed Rivera with complex regional pain syndrome of his left upper limb, noted a limited range of motion and continued pain, and recommended a pain management program, which was completed under the direction of Dr. Kelly Coleman.

¶6.　Rivera filed a petition to controvert with the Commission on July 24, 2018, claiming he suffered injuries to his left shoulder, left arm and hand, and neck. RDJJ answered on August 8, 2018, admitting that Rivera suffered injuries while working as a chicken catcher for RDJJ, but disputing the nature and extent of Rivera's injury. Rivera then filed a motion for medical treatment and payment of compensation on October 3, 2018, requesting the authority to choose his own physician and seeking payment of all compensation benefits. RDJJ responded on October 5, 2018, objecting to Rivera's request to choose a second physician and suggesting an evaluation by a court-appointed independent medical evaluator

3

instead.

¶7.    On December 10, 2018, the administrative judge (AJ) ordered an independent medical evaluation, declaring that Rivera could undergo a comprehensive evaluation by the doctor he had chosen, requesting that the chosen doctor provide a written narrative, and ordering RDJJ to pay the expenses of Rivera's evaluation. Thereafter, on January 9, 2019, RDJJ moved to exclude Rivera's job search evidence, claiming Rivera's job search was fraudulent and irrelevant because he was not legally eligible to work in the United States.

¶8.    The AJ heard RDJJ's motion to exclude and Rivera's petition to controvert on February 12, 2020, during which Rivera was the only person to testify. The AJ reviewed deposition testimony from Rivera and Dr. Line; medical reports from STATCare, Dr. Line, Dr. Hurt, Dr. Salloum, and Dr. Coleman; Rivera's FCE; reports from physical therapy; evidence relating to Rivera's job search; Rivera's wage statement; and Rivera's medical records. Specifically, the AJ's findings were based on Rivera's "medical impairment rating and restrictions and limitations and his inability to return to his former job and the substantial acts of this employment and the employer's refusal to rehire him."

¶9.    On May 15, 2020, the AJ entered an order denying RDJJ's motion to exclude Rivera's job search information and addressed the existence, nature, and extent of Rivera's disability. In denying RDJJ's motion to exclude, the AJ determined:

> [T]he claimant may be unable to find work due to his immigration status, but his immigration status did not arise out of and in the course of his employment or follow as a natural consequence of his injury. The job search herein is hampered by the claimant's immigration status, his elementary Mexican

4

education, his lack of communication and language skills and the paucity of jobs in the area of the claimant's domicile that would be a match for his limited skills and prohibition physically to do jobs outside of the heavy labor market.

¶10.  The AJ further found:

The claimant's job as a "chicken catcher" may be viewed as his usual occupation due to the length of claimant's tenure at RDJJ Services, Inc. and the fact that this job is viewed in the heavy duty classification, the type of jobs claimant had performed in the past, and all other relevant factors. Further, the employer/carrier did not offer up any evidence to the contrary with their defense that was premised on the fact that the claimant was an illegal alien/immigrant.

¶11.  Accordingly, the AJ held that Rivera had "suffered a one hundred percent (100%) functional loss of use for industrial purposes of the left upper extremity," and ordered RDJJ to pay permanent partial disability benefits for two hundred weeks.

¶12.  On June 2, 2020, RDJJ and Accident Fund filed a petition for review of decision, arguing several errors: the designated average weekly wage was contrary to the weight of credible evidence; the denial of the motion in limine was contrary to law; finding a 100% occupational loss was contrary to credible evidence and law; and ordering an independent medical evaluation by Rivera's chosen doctor was contrary to law. Thereafter, the Commission entered its order on September 2, 2020, amending the AJ's calculation of Rivera's average weekly wage and compensation rate, but otherwise affirming the AJ's order. Aggrieved, RDJJ and Accident Fund appeal.

**STANDARD OF REVIEW**

¶13.  "This Court employs a limited standard when reviewing a workers' compensation

appeal." *Mueller Indus. Inc. v. Waits*, 283 So. 3d 1137, 1141 (¶10) (Miss. Ct. App. 2019). The Commission is the ultimate fact-finder in a workers' compensation case, and "decisions by the Commission on issues of fact and credibility" must be given deference. *Imperial Palace Casino v. Wilson*, 960 So. 2d 549, 552 (¶9) (Miss. Ct. App. 2006). Where substantial evidence supports the Commission's order, we must affirm on appeal. *Id*. This Court will reverse only where the Commission's order was "clearly erroneous and contrary to the overwhelming weight of the evidence." *Id*. Further, "[a] finding is clearly erroneous when, although there is some slight evidence to support it . . . on the entire evidence[, the reviewing court] is left with the definite and firm conviction that a mistake has been made by the Commission in its findings of fact and in its application of the Act." *Barber Seafood Inc. v. Smith*, 911 So. 2d 454, 461 (¶27) (Miss. 2005).

¶14.   "A Commission decision that is supported by substantial evidence may not be overturned even if, were this Court acting as the fact-finder, we would have reached the opposite conclusion." *Lifestyle Furnishings v. Tollison*, 985 So. 2d 352, 358-59 (¶17) (Miss. Ct. App. 2008). On appeal, "[i]t is not the role of the reviewing court to determine where the preponderance of evidence lies, when the evidence is conflicting, given that it is presumed that the Commission as trier of fact has previously determined which evidence is credible and which evidence is not." *Id*.

## ANALYSIS

¶15.   The first ground on which RDJJ appeals is that the Commission's award of 100%

6

industrial loss of use of Rivera's left shoulder is not supported by substantial evidence. RDJJ alleges three errors in the Commission's examination of the evidence: illegal employment as a chicken catcher should not be included in "usual employment"; unreasonable evidence of a job search due to classification as an undocumented immigrant; and lack of medical evidence or "other proof" to raise the presumption of total loss of industrial use.

## I. "Usual Employment"

¶16. The Mississippi Supreme Court has defined "usual employment" as

> broader in scope than the job held at the time of the injury. . . . Usual employment in this context means the jobs in which the claimant has past experience, jobs requiring similar skills, or jobs for which the worker is otherwise suited by his age, education, experience, and any other relevant factual criteria.

*Meridian Prof'l Baseball Club v. Jensen*, 828 So. 2d 740, 747 (¶20) (Miss. 2002) (citation omitted). In a subsequent case, the supreme court affirmed the broad scope of "usual employment" and stated "the Commission should look to the entire factual context to make such a judgment." *Weatherspoon v. Croft Metals Inc.*, 853 So. 2d 776, 779 (¶14) (Miss. 2003).

¶17. RDJJ correctly acknowledges that Rivera's "usual employment" is broader in scope than the chicken-catcher job he held at the time of his injury and includes jobs requiring skills similar to his prior employment. But RDJJ argues that Rivera's job as a chicken catcher should not be considered his "usual employment" because he was never legally employed in the United States, even though it was the specific job RDJJ employed him to perform for

7

over a decade at the time of the injury. RDJJ cites *Jensen* and *Weatherspoon* in an attempt to illustrate that, instead, only his legal employment in Mexico working heavy duty, manual labor jobs constitutes his "usual employment."

¶18.    RDJJ misconstrues the application of the supreme court's rulings in *Jensen* and *Weatherspoon*. In *Jensen*, the court found the claimant had not suffered a total occupational loss of use because he was young, educated, and had found post-injury employment. *Jensen*, 828 So. 2d at 750 (¶25). The court also found no total occupational loss in *Weatherspoon* because the claimant only worked for the employer for a short time prior to the injury, and the claimant was able to find a job as a truck driver after her injury. *Weatherspoon*, 853 So. 2d at 779 (¶13). Neither *Jensen* nor *Weatherspoon* addressed the necessary legality for a job to be considered "usual employment." Accordingly, *Jensen* and *Weatherspoon* do not support RDJJ's argument for excluding illegal employment. Therefore, RDJJ has failed to cite relevant caselaw substantiating its argument that only Rivera's employment in Mexico should constitute "usual employment." In a prior workers' compensation case, this Court "not[ed] that [the claimant] failed to cite any authority whatsoever in support of her appeal to this Court" and held, "[t]ypically, an appellant's lack of authority renders an issue procedurally barred from review on appeal." *Roberson v. LFI Fort Pierce Inc.*, 3 So. 3d 788, 789-90 (¶5) (Miss. Ct. App. 2008); *see also J.P.M. v. T.D.M.*, 932 So. 2d 760, 779 (¶61) (Miss. 2006) (holding where "[the party] has failed to cite any authority, let alone any relevant authority, we find that [the party] is procedurally barred from raising [an] issue on appeal"). Because

8

RDJJ has failed to cite relevant authority, we decline to address the issue of whether Rivera's "usual employment" includes only his legal employment in Mexico.

¶19. Here, the Commission's order shows it considered more than Rivera's job at the time of the injury and took into consideration the entire factual context of this workers' compensation claim. The Commission concluded that the

> "[c]laimant had been a chicken catcher for fourteen (14) years before the injury; and, prior to that position, the [c]laimant had worked in heavy, unskilled manual labor. Based on the evidence as a whole, we broadly deem the [c]laimant's usual employment to be chicken catching, poultry work, and/or heavy, unskilled manual labor."

Thus, the Commission's decision, which was based on Rivera's employment as a chicken catcher, was not clearly erroneous or contrary to the overwhelming weight of the evidence.

## II.     Rebuttable Presumption of Total Industrial Loss of Use

¶20. RDJJ alleges the Commission erred in finding a 100% industrial loss of use of Rivera's left upper extremity for three reasons: he is not restricted to sedentary duty; there was no "other proof" that he is unable to perform the substantial acts of his usual employment; and his job search was unreasonable.

### A.     Restricted to Sedentary Duty

¶21. The Commission found Rivera raised a rebuttable presumption of total industrial loss, in part, because "the FCE restricts [Rivera] to less than eight hours a day in the sedentary category work." RDJJ claims that "there [was] no medical evidence that suggests [Rivera] has sedentary restrictions[,]" and he has not suffered a 100% loss of industrial use of his left

9

arm. RDJJ argues instead that "the medical evidence shows that [Rivera] will eventually be able to return to heavy duty jobs other than chicken catcher"; and "[Rivera] 'is not medically contraindicated from doing reasonable below[-]shoulder[-]level work at this time.'" RDJJ points to evidence from the testimony and reports of Dr. Line, from Dr. Hurt's notes regarding Rivera's lack of cooperation, and the lack of medical explanation for Rivera's pain complaints to show that classifying Rivera's work level as sedentary is unwarranted.

¶22.     The supreme court has held, "that disability need not be *proved* by medical testimony as long as there is medical testimony which will *support* a finding of disability." *Hall of Miss. Inc. v. Green*, 467 So. 2d 935, 938 (Miss. 1985). This Court has further explained, "[t]he medical evidence is sufficient if it supports, even if it does not fully prove, a finding of disability." *Lang v. Miss. Baptist Med. Ctr.*, 53 So. 3d 814, 822 (¶28) (Miss. Ct. App. 2010). Therefore, as long as there is medical testimony to support the Commission's finding that Rivera is subject to sedentary restriction, this Court must affirm.

¶23.     Rivera was injured while working on September 1, 2016, and he presented to Dr. Line for evaluation and treatment on October 17, 2016. Dr. Line performed several surgeries on Rivera's left arm between October 2016 and December 2018. Despite multiple surgeries and Dr. Line's attempts to treat Rivera's injury, Rivera continued to have pain and a lack of improvement in his shoulder. Rivera's range of motion and rotator-cuff strength improved a little over time, but during Rivera's checkup on November 22, 2017, Dr. Line specifically noted that Rivera "really made no improvement; [has] not been able to go back to work; [has]

not [been] able to meet the function of his job; [and] he continues to have pain and limitations with motion and stiffness." Dr. Line opined that there was nothing else he could do for Rivera and suggested that Rivera seek a second opinion.

¶24.    On January 23, 2018, Rivera presented to Dr. Hurt for a second opinion and possible surgical intervention. Dr. Hurt noted that Rivera "continued to have pain and states that he cannot go back to work and cannot lift the shoulder and has significant loss of motion and pain."

¶25.    On April 3, 2018, based on Dr. Line's referral, Rivera saw Clayton for an FCE to determine his ability to perform specific job-related tasks. Clayton had Rivera attempt an array of tasks, such as bilateral lifting and carrying, unilateral lifting and carrying, walking, reaching, grasping, pinching, squatting, bending, and simulating a wide stance picking up chickens and throwing to the right. According to her report, Clayton was able to evaluate Rivera's ability to perform chicken catcher job-specific tasks to the extent of "wide stance simulating picking up chickens and throwing to the right." She observed that Rivera was "unable to engage in simulated throwing due to level of pain and compromised mechanics," and stated that the "[t]ask is placed on an avoid" basis.

¶26.    According to Rivera's FCE, Clayton determined that Rivera had an 18% upper-extremity impairment for range of motion loss; 11% whole-person impairment; and "demonstrated the ability to perform 28.8% of the physical demands of his job as a [c]hicken [c]atcher." The FCE concluded that Rivera "demonstrated the ability to perform within the

11

SEDENTARY Physical Demand Category based on the definitions developed by the US Department of Labor and outlined in the Dictionary of Occupational Titles." But, as Clayton noted, "[Rivera's] job as a [c]hicken [c]atcher is classified within the MEDIUM Physical Demand Category"; and thus his ability to perform "is below his job[']s demand category." The FCE stated that "[Rivera] is unable to work full time because he can only work within the SEDENTARY physical demand category . . . for up to 5 hours and 17 minutes per day while taking into account his need to alternate sitting and standing." Moreover, his initial "unskilled sedentary occupational base is significantly eroded because he is unable to lift floor to waist 10 lbs or slightly less, power lift 10 lbs or slightly less, bilateral carry 10 lbs or slightly less, sit frequently, and sit at least 2 hours at one time."

¶27. When Rivera returned to Dr. Line's office post-FCE, Dr. Line noted that Rivera "was given a sedentary work level with restrictions." Dr. Line initially stated, "I feel the restrictions [Rivera] was given were a little bit exaggerated," and then proceeded to opine that "the impairment rating, FCE, and work restrictions I think are temporary and will improve with time back to a fairly high level; however, it just will take time to reach that point." Even more significant, in the May 7, 2018 Workers' Compensation Update report, Dr. Line specifically wrote, "[P]atient may return to work with restrictions per FCE. . . . Other Restrictions: MMI Sedentary Work Level. . . . Restrictions per FCE."

¶28. Seven months later, Rivera went back to Dr. Line because he was "still having pain in his shoulder and unable to work because of his continued shoulder problems." Dr. Line

12

observed that Rivera was "able to grip with his hand," his "[s]trength appear[ed] to still be good, maybe weak in abduction testing," but "[i]t [was] hard to tell whether it [was] pain or actually weakness." The report notes that after examination, Dr. Line "[thought] he ha[d] a pain syndrome now that [was] really limiting him more than any structural abnormality." Dr. Line concluded that, "[w]ith regards to work, he is able to do whatever he can tolerate at this point. I think it would be good for him to be allowed to be employed at some level until this resolves. . . . In my opinion, he is not medically contraindicated from doing reasonable below[-]shoulder[-]level work at this time."

¶29.     Rivera then presented to the medical staff at Bienville Orthopaedic Specialists LLC complaining of severe pain in his left shoulder. On May 30, 2019, Dr. Salloum, an orthopaedic specialist, observed that Rivera "had 5/5 strength for flexion and extension of the elbow and wrist. He [had] good grip strength." However, it was the doctor's "impression that the [Rivera] likely [had] chronic regional pain syndrome." Notably, Dr. Salloum did not address Rivera's work status or restrictions. Rivera then presented to Dr. Coleman on July 8, 2019, and the report noted that Rivera "report[ed] the pain [had] a throbbing, a shooting, a stabbing, an aching, a heavy, [and] exhausting . . . quality" and found that his range of motion had decreased. Notably, Dr. Coleman did not comment specifically on Rivera's work restrictions either. On July 11, 2019, Dr. Salloum saw Rivera for a second time, due to limited range of motion with pain, and concluded there was nothing else he could do to help Rivera, but Dr. Salloum's report was silent as to Rivera's work status. Rivera then presented

13

to Amanda Rayburn, a nurse practitioner, who specifically wrote at the end of her report from August 8, 2019, "[n]o change in work status." When Rayburn evaluated Rivera at a follow-up appointment on November 11, 2019, Rayburn again specifically noted that there was "[n]o change in work status."

¶30.    As the record indicates, medical evidence from the FCE clearly placed sedentary restrictions on Rivera. The language within the FCE listed the tasks Rivera was asked to perform and then explicitly stated that Rivera "demonstrated the ability to perform within the SEDENTARY Physical Demand Category," which "is below his job[']s demand category." The FCE explained in detail how Rivera performed each task and analyzed each section and then delineated the manner and nature of the restrictions that the sedentary category placed on Rivera's work level. Additionally, Dr. Line's report from Rivera's post-FCE appointment acknowledged that Rivera was given a sedentary work level and adopted the sedentary work restrictions as part of the assessment report. The fact that Dr. Line believed the restrictions were "a little bit exaggerated" and only temporary does not remove or negate the sedentary work restrictions. Thereafter, when Rivera presented to the Bienville Group in August and November 2019, Rayburn specifically noted Rivera's work status had not changed, implying Rivera was still under the FCE sedentary work-level restrictions. Furthermore, since the Commission is permitted to consider lay testimony, it is plausible that the Commission found Rivera's testimony stating he physically could not use his left arm and could not work to be contributing evidence of sedentary work-level restrictions.

14

¶31. This Court recognizes that Dr. Line's statements within his December 5, 2018 report could raise doubt as to Rivera's sedentary restrictions. Dr. Line's report could be construed as modifying Rivera's work level to a level above sedentary by stating that Rivera could "do whatever he can tolerate at this point." Nonetheless, Dr. Line stated immediately afterward that Rivera should "be allowed to be employed at some level" and is not medically prevented from "below[-]shoulder[-]level work." Rivera's sedentary work restrictions as listed in his FCE did not restrict him from below-shoulder-level work entirely but rather restricted lifting a certain amount of weight. Thus, there is substantial record support for the Commission's findings that Dr. Line had not removed the FCE restrictions and that Rivera was still subject to a sedentary work level.

¶32. As noted, this Court's only task is to evaluate whether there is substantial evidence in the record to support the Commission's decision without re-evaluating the credibility and weight of the evidence. A thorough review of the record shows substantial evidence supports the Commission's finding that Rivera was restricted to sedentary duty.

**B.      Ability to Perform Substantial Acts of Usual Employment**

¶33. Where a partial loss of use of a scheduled member "causes the worker to be unable to perform substantial acts of the worker's usual occupation. . . . the actual occupational effect of this partial impairment has substantially the same effect as total loss of use of the member." John R. Bradley & Linda A. Thompson, *Mississippi Workers' Compensation Law* § 5:44 (2020 update). In determining "whether the worker has lost all or only part of the use

15

of the member" for disability benefit purposes, "the extent of loss of use of the member in the worker's usual occupation is the greatest factor[.]" *Id*. Thus, it follows that when partial impairment is in effect a total, permanent loss, "benefits for the permanent injury are not limited to the proportion of medical or functional impairment of the scheduled[ ]member." *Id*.

¶34.    When examining the evidence to "determin[e] the percentage of loss to be assigned to an injury," "[t]he Commission is not confined to medical testimony. . . . Lay testimony may be considered to supplement medical testimony but 'the probative value of any witness'[s] testimony is for the fact-finder to determine.'" *McGowan v. Orleans Furniture Inc.*, 586 So. 2d 163, 167 (Miss. 1991) (citation omitted). The relevant "question in these cases is the degree of loss of use of the member for wage earning purposes," and "whether [the claimant] suffered a 100% industrial loss of use is a question of fact to be determined from the evidence as a whole." *Id*. at 166-67. The supreme court has stated that "[f]actors which this [c]ourt has considered in determining loss of wage earning capacity include the amount of education and training which the claimant has had, his inability to work, his failure to be hired elsewhere, the continuance of pain, and any other related circumstances." *Id*. at 167.

¶35.    RDJJ alleges that Rivera has not presented evidence that he cannot perform the substantial acts of his usual employment and cannot prove a total loss of use. RDJJ claims Rivera told prospective employers that he could only work with one arm even though Dr.

16

Line had not imposed such a restriction; he was offered a post-injury job driving trailers; and he had minimal pain complaints at his last doctor appointment.

¶36. As authority for its decision, the Commission cited *Jensen*, in which the supreme court articulated a rebuttable presumption for loss-of-use-of-a-scheduled-member cases:

> where a permanent partial disability renders a worker unable to continue in the position held at the time of injury, . . . such inability creates a rebuttable presumption of total occupational loss of the member, subject to other proof of the claimant's ability to earn the same wages which the claimant was receiving at the time of injury. [A] presumption [of total occupational loss] arises when the claimant establishes that he has made a reasonable effort but has been unable to find work in his usual employment, or makes other proof of his inability to perform the substantial acts of his usual employment.

*Jensen*, 828 So. 2d at 747-48 (¶21) (internal quotation marks omitted).

¶37. The Commission also cited a portion of *Mueller Industries Inc. v. Waits*, 283 So. 3d 1137 (Miss. Ct. App. 2019), in its explanation of applicable law, but its findings placed less emphasis on the precedent in *Waits*. While this Court agrees that the *Jensen* case is applicable here, the holding in *Waits* simplifies and lends greater support for the Commission's findings. *Waits* clarified that "[w]hen the evidence shows inability to perform substantial acts of the usual employment, total loss of use of the member exists without further inquiry into occupational effect or effect on wage-earning capacity." Bradley & Thompson, *supra*, § 5:46.

¶38. The Court's opinion in *Waits* provided that a claimant is able to establish total occupational loss by showing *either* that "he has made a reasonable effort but has been unable to find work in his usual employment," *or* by "mak[ing] other proof of his inability

17

to perform the substantial acts of his usual employment." *Id*. at 1142-43 (¶17). The Commission had "found that due [to] Waits's arm and shoulder disability resulting from his injury, he was left 'unable to return to his previous employ' and 'unable to perform the substantial acts of his usual occupation.'" *Id*. at 1143 (¶18). Consequently, "the Commission did not engage in an analysis as to whether Waits established that he had made a reasonable effort to find work in his usual employment." *Id*. The Court held that "[t]he Commission's finding that Waits's permanent partial disability rendered him unable to perform the substantial acts of his usual employment created a rebuttable presumption of total occupational loss of his right arm and shoulder." *Id*. at 1150 (¶45). Moreover, the Court also noted that the Commission's findings correctly "acknowledged that wage earning capacity was not part of Waits's burden of proof," explaining that "[a] claimant is not required to make a work search to prove an industrial loss of use of a scheduled member . . . because he is not required to meet the test for loss of wage earning capacity in body-as-a-whole cases." *Id*. at 1149-50 (¶44).

¶39.    The ruling in *Waits* is consistent with the supreme court's holding in *McGowan.* To show that the partial loss of use is, in effect, a total loss of use, the *McGowan* court held that the test asks whether the employee "is prevented by his injury from doing the substantial acts required of him in his usual occupation, or if his resulting condition is such that common care and prudence require that he cease work[.]" *McGowan*, 586 So. 2d at 166. *McGowan* held "that as a matter of law, the worker had met the legal test for entitlement to benefits without

18

seeking other employment." Bradley & Thompson, *supra*, § 5:46.

¶40.   As part of Rivera's job, "he would grab multiple chickens at a time and throw them in the box." Here, the Commission determined that Rivera presented medical evidence proving he could not return to his position with RDJJ as a chicken catcher.  Notwithstanding the medical evidence, Rivera's unrebutted testimony that RDJJ asked "what [he] was . . . going to do with just the one arm" and its refusal to rehire him because it had "no use" for him shows that RDJJ recognized Rivera could not perform the substantial acts of a chicken catcher. Based on *Waits*, this evidence gave rise to the rebuttable presumption of total loss of use.

¶41.   The Commission found proof that Rivera was incapable of performing the substantial acts of his job from "Dr. Line's opinion that [Rivera] cannot return to his position as a chicken catcher." The following discussion occurred during Dr. Line's deposition:

> [Dr. Line]:   [Chicken catching is] very, very, vigorous work . . . because of the amount of weight and the repetitiveness of what they do.
>
> . . . .
>
> [Attorney]:   Does it give you any pause to think that he's going to be able to return to doing that [chicken-catcher] type of activity?
>
> [Dr. Line]:   I would say that would be unlikely. That's difficult for a person with a normal shoulder to do that anyway.
>
> . . . .
>
> [Attorney]:   And you also testified it's unlikely he will be able to return to work as a chicken catcher in his former capacity?
>
> [Dr. Line]:   Most likely.

19

. . . .

[Attorney]: Doctor, with regard to the question of would he be unable to return to work as a chicken catcher, would that be due to his work injury or just due to the level of the difficulty and harshness of that type of work?

. . . .

[Dr. Line]: I think in that case it's more to the nature of the job. But that's like anybody who has a shoulder issue with that job description, I would say it would be unlikely to go back even with almost perfect – I'd be very uncomfortable for him going back to that job after a significant problem because of the nature of the work.

¶42.    Based on the record, Dr. Line undoubtedly believed that Rivera's arm injury would prevent him from being able to grab "six and eight . . . live chickens . . . [that are] active and trying to get away" and throw them into a box. Therefore, Rivera would be prevented from performing the substantial acts of his usual employment. Nonetheless, even broadening "usual employment" beyond catching chickens for RDJJ to "chicken catching, poultry work, and/or heavy, unskilled manual labor," Dr. Line's testimony still indicated Rivera could not perform the substantial acts of employment. The following exchange also occurred during Dr. Line's deposition:

[Dr. Line]: His motion was still restricted enough to allow him to do overhead work. He was still having pain . . . I felt that over time that would improve and his function would get better and his pain[,] and he would ultimately be able to get back to work.

. . . .

[Attorney]: So from a permanent standpoint, you wouldn't place any permanent restrictions on Mr. Rivera?

20

[Dr. Line]: Well, you're always caught in a point in time so I can't state to what he -- I know what he might and possibly and ultimately reach as far as his activity level, but I can't state that he in his particular case will, so I would say at this point he has the impairment rating and the function restrictions that he was given.

¶43. According to Rivera's FCE, his work restrictions included occasional bilateral lifting up to five pounds, occasional bilateral carrying up to five pounds, occasional unilateral lifting up to two pounds, and no unilateral carrying. He was also restricted to occasional walking, above-shoulder reaching, pinching, bending, and squatting. But Rivera was told to entirely avoid reaching, simple and firm grasping, bending, sustained squatting, and wide-stance simulating picking up chickens and throwing to the right. Dr. Line's statement that the restrictions in Rivera's FCE applied and that the FCE prevented him from lifting more than five pounds showed that Rivera was unable to perform the substantial acts of employment in heavy/unskilled manual labor.

¶44. Thus, substantial evidence in the record supported the Commission's finding that Rivera was unable to perform the substantial acts of his usual employment. Under *Waits*, the rebuttable presumption of total industrial loss of use arose since Rivera proved an inability to perform the substantial acts of his usual employment.

¶45. Once the presumption has arisen, "the next question this Court must answer is whether [RDJJ] successfully rebutted the presumption of total occupational loss of the members with proof of [Rivera's] ability to earn the same wages which he was receiving at the time of injury." *Waits*, 283 So. 3d at 1150 (¶45). RDJJ bore the burden of "rebut[ting] this

presumption by showing 'all the evidence concerning wage-earning capacity, including education and training which the claimant has had, his age, continuance of pain, and any other related circumstances.'" *Id*. at 1143 (¶17).

¶46.  RDJJ failed, however, to offer relevant evidence to rebut this presumption. The Commission found that the only rebuttal RDJJ asserted was "that the Employer did not offer the Claimant a post-MMI job because it is illegal for an employer to hire an illegal alien . . . [a]t the hearing, however, the Employer/Carrier did not present any testimony or other evidence to support this argument."

### III.    Job-Search Evidence

¶47.  Finally, RDJJ contends that Rivera's job-search evidence was unreasonable and should have been excluded from consideration. This Court's decision in *Waits* holds that once the Commission has found substantial evidence showing the claimant is unable to perform the substantial acts of his usual employment, the claimant is not required to also prove a reasonable effort to find work in his usual employment. *Id.* at 1142-43 (¶17). Because we find that the Commission properly held that Rivera proved he was unable to perform the substantial acts of usual employment, and RDJJ failed to rebut the presumption, our inquiry ends there. Thus, we decline to further address the issue of whether Rivera's job search was reasonable. "The purpose of our appellate review is not to settle questions in the abstract or to issue advisory opinions." *Oak Creek Invs. LLC v. Atlas FRM LLC*, 307 So. 3d 503, 508 n.4 (Miss. Ct. App. 2020) (quoting *Scoggins v. Baptist Mem'l Hosp.-Desoto*, 967

22

So. 2d 646, 649 n.1 (Miss. 2007)).

## CONCLUSION

¶48.   The record reflects that the Commission considered all the evidence provided by Rivera and RDJJ in finding that Rivera suffered a 100% total industrial loss of use and in concluding that RDJJ did not rebut this presumption. Therefore, the Commission did not err in finding a 100% total industrial loss of use based on Rivera's sedentary work level and restrictions. Because substantial evidence supported the Commission's decision, we affirm.

¶49.   **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**