# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-WC-01050-COA

**CITY OF VERONA AND MISSISSIPPI**                                    **APPELLANTS**
**MUNICIPAL WORKERS' COMPENSATION**
**GROUP**

**v.**

**STEPHANIE MOFFETT**                                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/26/2022 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEYS FOR APPELLANTS: | GEORGE E. READ JOSEPH MILES FORKS |
| ATTORNEY FOR APPELLEE: | KEGAN TREMAYNE COLEMAN |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 05/07/2024 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     Stephanie Moffett, a former police officer for the City of Verona, was involved in a near-death assault while she was on duty in February 2017. Moffett sought workers' compensation benefits after sustaining several physical injuries and developing post-traumatic stress disorder (PTSD) as a result of the assault. The City of Verona challenged her mental injuries and asserted that she had no loss of wage-earning capacity. Following a hearing on the matter, the administrative judge (AJ) ruled that Moffett suffered a 50% loss of wage-earning capacity. Moffett and the City of Verona appealed the AJ's decision to the Mississippi Workers' Compensation Commission (Commission). The

Commission amended the AJ's order and found that Moffett actually suffered an 80% loss of wage-earning capacity. After reviewing the record, we find no error and affirm the Commission's decision.

**FACTS**

¶2. After serving nine years in the United States Army, Stephanie Moffett continued her calling for service by becoming a police officer. She worked as a reserve police officer with the Tupelo Police Department and eventually graduated from the Tupelo Police Academy in 2003. Moffett joined the Verona Police Department in 2008. She was the only female in the department. During her time there, she gained a special certification in domestic violence and was frequently tapped to respond to domestic disputes. In addition to being a police officer, Moffett also had some part-time jobs. She worked as a school resource officer for the Lee County School District at Verona Elementary School. She was a process server for two different companies. She worked at Cooper Tire. She also had her own cleaning business.

¶3. On February 27, 2017, Moffett was dispatched to handle a domestic dispute at an apartment building and secure the scene for an ambulance to transport a mentally ill patient to a behavioral center. When she arrived at the apartment, she saw Sylvester Sykes, an individual who had previously assaulted her while she was on duty. She indicated that she did not initially get close to him. However, Sykes threw what appeared to be crack cocaine on the floor and announced that he had been "smoking crack and getting drunk with Tupac all day." He then jumped up and grabbed his girlfriend's oxygen tubing out of her nose,

2

wrapped it around his arm, and told her, "Die Bitch." As Moffett attempted to get the oxygen tubing back, Sykes grabbed her weapon and said he was going to kill everyone in the house. They fought, and Moffett eventually ended up on the floor in a fetal position. While she was on the ground, Sykes punched and kicked her in the head, neck, and shoulders as she went in and out of consciousness. This lasted approximately eleven minutes until Officer Steven Johnson from the Shannon Police Department arrived. Three sheriff's deputies arrived shortly after. The dispatchers later revealed to her that they thought she was going to die before help arrived. Verona Police Chief JB Long was supposed to be her backup, but he arrived thirty minutes late.[1]

¶4. Moffett was treated by the paramedics in the ambulance and they advised her that she needed to go to the hospital. She drove herself to the North Mississippi Medical Center emergency department. No one from her police department accompanied her. She was diagnosed with a contusion of her left jaw and neck. She was released with pain medication, including a muscle relaxer. Moffett followed up with her primary physician, Dr. Donald

---

[1] In Dr. Mark Webb's IME report, which was admitted in evidence, he stated that "[Moffett] states that . . . the Chief allegedly had his radio off . . . ." This assertion was clarified during Dr. Webb's deposition, also admitted, and considered by the Commission:

> [Webb]: I--I--I'd want to know-- she said somebody came, but I don't know -- because I know she hit the panic button, but I don't know whether -- whether it was the chief or not.

> [Read]: Okay. Well, I -- it was actually sheriff deputies. **Chief has testified he was at home with his radio off.**

> [Webb]: Off. Okay. Okay.

(Emphasis added).

3

Smith, who referred her to several doctors to treat both her physical and mental injuries stemming from the assault.

¶5.	In regards to her mental injuries, Moffett was first referred to therapy with Mandy Brown. After Brown determined the gravity of her symptoms, she referred Moffett to a psychiatrist, Dr. Amy Miller. Dr. Miller diagnosed her with PTSD, depression, and anxiety. Dr. Miller explained that she met all primary criteria and several sub-criteria for a diagnosis of PTSD. She also explained that the criteria that separate her diagnosis from depression or anxiety include that there must have been a traumatic, near-death event. She identified that event as the brutal assault that Moffett endured. After the assault, Moffett was having severe migraines, insomnia, irritability, crying spells, isolation, nightmares, intrusive thoughts about death, and flashbacks of the assault. She would fight herself in her sleep and wake up with scratches and bruises all over her body. She had several incidents of extreme anger responses to situations. She became very hypervigilant and always carried a gun on her. She even slept with a gun under her pillow. She claimed that she had a decreased appetite and lost about forty pounds since the assault. Moffett also experienced problems with remembering things and staying focused, so Dr. Miller had to perform shock treatments on her head. None of these symptoms occurred prior to the assault.

¶6.	Moffett believes that the assault was set up by Chief Long due to previous issues she's had with him and other superiors at the Verona Police Department.[2] Prior to the assault,

---

[2] Moffett, whose maiden name is Goree, filed a federal lawsuit in 2017. There are some discrepancies regarding the chronology of the previous Chiefs in our record compared to that case. *See Goree v. City of Verona*, No. 21-60911, 2022 WL 3647279, at *1 (5th Cir. Aug. 24, 2022). For our purposes, it does not change the substance of her claim, the

4

Moffett filed a claim with the Equal Employment Opportunity Commission (EEOC) against interim Chief J.B. Long for sexual harassment in 2008. While the charge was pending, Chief Leo Mask became the new Chief and he promised her that she would no longer have to deal with those issues under his tenure. He also promised her a lifetime position if she dropped the lawsuit. With this promise, Moffett agreed to drop the lawsuit. However, she was subjected to sexual harassment again when Chief Anthony Anderson succeeded Chief Mask. She claims that one of the chiefs "took his penis out and sent pictures of his penis." Chief Anderson eventually resigned and at some point, Chief Long became the new Chief. Moffett claimed Chief Long began sexually harassing her again, so she filed a grievance with the City against him in January 2016. When recalling the harassment, she said, "[Chief Long] pulled out his penis in front of me . . . he was coming on to me . . . said in order for me to make assistant chief, he wanted me to have oral sex." She also claimed that he would comment about the size of his penis and "how he could make [her] feel like a young lady." Her grievance was investigated by the Verona Board of Aldermen; however, no inappropriateness was found. Chief Long then countered by filing a grievance against her alleging that she had tried to perform oral sex on him, but he refused her request.

¶7. In September 2016, Moffett filed a charge with the Equal Employment Opportunity Commission (EEOC) against the City of Verona alleging ongoing discrimination based on sex and retaliation from 2008 to 2016. Moffett claims that this caused Chief Long to harass her further, subjecting her to a hostile work environment.

---

Commission's finding, or our analysis and disposition.

¶8.     While the EEOC charge was still pending, Moffett was sent to the house of Slyvester Sykes. After the assault, two women approached Moffett one day and disclosed that Chief Long and a lady were going to have her killed. To substantiate these claims, both women provided sworn statements to the Lee County Sheriff.[3] Moffett claimed that she spoke with Sykes' girlfriend several weeks after the attack, and she admitted to Moffett that "the Chief made [Sykes] do it." Moffett also claimed she saw Sykes' daughter at a convenience store after the assault. The daughter and another man cursed and made verbal threats to her.

¶9.     Moffett was eventually released to return to work with restrictions, and she attempted to work on light duty; however, her superiors informed her that light duty was not available. She was no longer able to physically clean houses; therefore, her daughter had to take over her cleaning business. She also had to stop working as a process server. Moffett continued working as a school resource officer after the assault; however, Dr. Miller eventually concluded that it was no longer safe for her to continue working at the school. Moffett completed the school year in May 2018 and has not returned to work since.

## PROCEDURAL HISTORY

¶10.    Moffett reported her injuries to the Mississippi Workers Compensation Commission on February 28, 2017, and she began receiving temporary total disability benefits. Moffett filed a petition to controvert on April 7, 2017. In her petition, Moffett listed the following parts of her body that were injured: "right wrist, hands, fingers, arm, neck, left and right shoulder, concussion, low back, jaw on left side." She claimed that her temporary total

---

[3] This information was included in Dr. Miller's medical records, which can be found in Exhibit Volume I in our record on appeal.

disability benefits, medical benefits, and weekly benefits had not been paid and that her doctor's authorization had been denied. Her employer, the City of Verona, and its insurance carrier, Mississippi Municipal Workers' Compensation Group, filed their answer on April 27, 2017. In the answer, the City of Verona denied that she was temporarily disabled, permanently disabled, or had sustained a loss of wage-earning capacity. They also denied that the average weekly wage was correct. They listed the following as matters of dispute: "[r]easonableness and medical necessity of certain treatment; contribution of pre-existing disease, lesion or handicap and/or non-work related injury or event."

¶11. At the request of the City of Verona, Moffett received an independent medical evaluation by Dr. Rahul Vohra to assess her physical injuries on September 15, 2017. Dr. Vohra found that she reached MMI for her "complaints of diffuse pain without residual impairment or restrictions." However, he could not place her at MMI for her left shoulder pain, and he recommended an MRI to assess the anatomy and determine if further treatment would be needed. Dr. Vohra eventually placed her at MMI with an "impairment of 2% to the left upper extremity for subacromial bursitis and supraspinatus tendinopathy." At the end of his report, Dr. Vohra noted that Moffett appeared to be having psychiatric difficulties due to her "frequent crying, hypervigilance, flashbacks, and severe anxiety." He found that many of her symptoms were "consistent with PTSD symptomatology" and that it would be helpful if she had a psychiatric independent medical evaluation conducted to assess her mental injuries.

¶12. Moffett filed an amended petition to controvert on March 27, 2018, adding

depression, PTSD, and anxiety as alleged injuries. She began receiving partial permanent disability payments on May 5, 2018. The City of Verona filed an amended answer on March 28, 2018. Moffett and the City of Verona did not contest the 2% impairment to her left arm. However, the City of Verona contested that Moffett suffered any mental injuries as a result of the accident and claimed that it was a temporary aggravation of a pre-existing condition. They also attached a supplemental agreement reflecting that Moffett was entitled to permanent partial disability payments for the "2% loss of upper extremity, commencing on [April 7, 2018,] at the rate of $423.50 per week, and continuing for a period of [four] weeks." These payments were to be suspended on May 4, 2018, at which point she would be considered to have reached MMI. The agreement also stated that her temporary total disability payments would be suspended on July 13, 2018.

¶13. Moffett's psychiatric independent medical evaluation was conducted by Angela Koestler, Ph.D.,[4] on June 28, 2018. Dr. Koestler concluded that Moffett was likely suffering from major depressive disorder and somatic symptom disorder. Dr. Koestler also determined that Moffett should be considered at MMI with no restrictions or impairment for her mental injuries stemming from the assault. However, by the same token, she recommended that Moffett "continue in psychiatric treatment given the severity and chronic nature of her symptoms." Dr. Koestler further explained:

> [R]esults of this evaluation revealed an individual with a long history of what
> appears to be chronic somatic preoccupation and well-documented anxiety and

---

[4] Although Angela Koestler, Ph.D., was selected to conduct the psychiatric independent medical evaluation by the City of Verona, she is not a board-certified psychiatrist. The record indicates that she is a consulting psychologist.

depression. It is documented that she has experienced ongoing job-related conflicts, job and home-related stress, and stress in maintaining two full-time jobs and a part-time job. Throughout available medical records, beginning in 2007, it appears that she presented with multiple physical complaints, and her response to medical interventions and length of treatment to resolution, if any, of her symptoms appear to establish a behavioral pattern likely relevant to her current complaints and prognosis. It is the opinion of this examiner that Ms. Moffett's current psychiatric symptoms are preexisting and subject to exacerbations as documented in medical records. They were possibly exacerbated by the 2017 work-related assault; however, they are now considered at her preexisting symptom baseline.

¶14. Dr. Miller performed a follow-up evaluation on August 24, 2018, where she invalidated Dr. Koestler's medical conclusions and called her competence into question. In the report, Dr. Miller opined:

Ms. Koestler believes that her current PTSD symptomology is related to on-going job related conflicts and not due to the assault. In the two years prior to the assault, she was involved in litigation with City of Verona police department due to her claims of sexual harassment by her police chief. This litigation remains ongoing. As noted earlier, none of her current symptoms of PTSD have ever been documented in her medical record prior to the assault. To my knowledge, she has never taken a leave of absence from her job due to mental health reasons prior to the assault. I do not know how Ms. Koestler can state that her current symptoms are due to the ongoing litigation when for 2 years prior to the assault, she was never diagnosed with PTSD, never saw a mental health professional, and never had symptoms documented in her medical record by any of the multiple providers she saw in those two years. lt is my professional opinion that Ms. Koestler's conclusion is not backed up by the evidence provided in Stephanie's medical records. She opined that [the] patient "should currently be considered at MMI regarding the February 2017 assault ·with no restrictions or impairment." She recommended no further treatment regarding PTSD. In my last note that she had for review (9/20/17). I indicated that patient was harming herself in her sleep, not adequately performing her job duties (i.e. staying in her office all day), anxious all the time, having crying spells and nightmares, irritable (i.e. kids getting on her nerves), chest tightness, and jaw tightness to the point of pain (due to clenching from anxiety). I am not sure how she could read that and feel that Stephanie is at MMI. Looking back through her medical records, this is obviously not her baseline level of functioning. Ms. Koestler's

9

recommendation of no further treatment is malpractice in my opinion.

¶15. On June 21, 2019, the City of Verona filed a motion for an independent medical evaluation. The AJ granted the motion on July 15, 2019, and chose Dr. Mark Webb to perform an independent medical evaluation on Moffett. On August 6, 2019, Dr. Webb confirmed that Moffett was suffering from posttraumatic stress disorder due to the assault and that she was temporarily totally disabled; however, he pre-determined that would reach MMI twelve months following his evaluation. He acknowledged her pre-existing mental complaints yet maintained that the "main stressor . . . in Ms. Moffett's life is the attack by the gentlemen who allegedly was on Crack."

¶16. A year later, Dr. Webb performed a follow-up evaluation on Moffett. He determined that she had reached MMI and found that she had a mental and behavioral disorder impairment of twenty percent. He also found that "[s]he should go back to working as a resource officer in school or other jobs along that line."

¶17. On March 25, 2020, Moffett filed a motion to compel the employer/carrier to pay temporary total disability and medical bills. The AJ decided to hold the motion in abeyance until a full hearing on the merits could be conducted. The hearing was conducted on July 7, 2021. Moffett was the only witness to testify.

¶18. The AJ filed an order on March 1, 2022. In the order, the AJ concluded that Moffett developed PTSD as a result of the assault, and she suffered a 50% loss of wage-earning capacity. He explained that "a large area of employment in the fields where she has worked before would include jobs that might be traumatic or she may be subject to physical

10

confrontation."

¶19. Moffett filed a petition for review on March 21, 2022. The City of Verona filed a "Cross-Petition for Appeal and Review Before the Full Commission" on the same day.[5] The matter went before the Commission on September 12, 2022. The Commission filed an order on September 26, 2022, affirming in part and amending in part the AJ's order. The Commission agreed that Moffett suffered a loss of wage-earning capacity; however, the Commission deviated from the percentage the AJ found. The Commission ultimately found that Moffett suffered an 80% loss of wage-earning capacity as a result of her work injury. On October 11, 2022, the City of Verona appealed the Commission's order. On October 17, 2022, Moffett filed a pro se notice of a cross-appeal.

## STANDARD OF REVIEW

¶20. "Our appellate review in a workers' compensation case is limited to determining whether the Commission's decision was supported by substantial evidence, was arbitrary and capricious, was beyond the scope or power of the agency to make, or violated the claimant's constitutional or statutory rights." *Jones v. Univ. of Miss. Med. Ctr.*, 309 So. 3d 1135, 1142 (¶33) (Miss. Ct. App. 2021). "In particular, we review the facts on appeal not with an eye toward determining how we would resolve the factual issues were we the triers of the fact; rather, our function is to determine whether there is substantial credible evidence which would support the factual determination made by the Commission." *Id.* "If there is such substantial credible evidence, we are without authority to disturb that which the Commission

---

[5] Moffett and the City of Verona did not contest the 2% impairment to her left arm on appeal before the Commission.

11

has found, even though that evidence would not be sufficient to convince us were we the factfinders." *Id*. at 1142-43 (¶33) (internal quotation mark omitted). "On appeal, we review matters of law before the Commission de novo, while according the interpretation of the Commission great weight and deference." *Id*. at 1143 (¶33) (internal quotation mark omitted).

## DISCUSSION

¶21.    "Under statutory law, the Commission sits as the finder of fact." *Raytheon Aerospace Support Servs. v. Miller*, 861 So. 2d 330, 335 (¶11) (Miss. 2003) (citing *Inman v. CocaCola/Dr. Pepper Bottling Co. of Memphis,* 678 So. 2d 992, 993 (Miss.1996)). "Where there is conflicting medical testimony, the Commission has the responsibility to apply its expertise and determine which evidence is more credible." *Weathersby v. Miss. Baptist Health Sys. Inc.*, 195 So. 3d 877, 882 (¶21) (Miss. Ct. App. 2016) (quoting *Washington v. Woodland Vill. Nursing Home*, 25 So. 3d 341, 355 (¶33) (Miss. Ct. App. 2009)). "Thus, 'where medical expert testimony is concerned, the Supreme Court has held that whenever the expert evidence is conflicting, the Court will affirm the Commission whether the award is for or against the claimant.'" *Id*. (quoting *Raytheon*, 861 So. 2d at 336 (¶13)). "[T]he test in [a multi-expert] case is not one of the weight of the sheer number of duly qualified experts, but rather the credibility of the expert(s) based on the weight of objective proof, evidence, or results used in rendering an opinion." *Hayes v. Howard Indus. Inc.*, 284 So. 3d 787, 795 (¶26) (Miss. Ct. App. 2019) (quoting *Smith v. Com. Trucking Co.*, 742 So. 2d 1082, 1087 (¶13) (Miss. 1999)). The Commission found Dr. Miller's testimony, medical findings, and

the results used in rendering her opinion to be more credible. The dissent, on the other hand, is trying to assign more weight to Dr. Koestler's and Dr. Webb's medical findings. This Court is not at liberty to do so. That is the job of the fact finder. "A reviewing court commits error if it simply re-weighs the evidence and substitutes its judgment for that of the Commission." *Lifestyle Furnishings v. Tollison*, 985 So. 2d 352, 358 (Miss. Ct. App. 2008) (citing *Raytheon*, 861 So. 2d at 335 (¶11)).

¶22. There is substantial credible evidence in the record that supports the Commission's decision. The Commission relied on most of the records and testimony provided by Dr. Miller, and it is clear that it found her medical findings more credible. Dr. Miller, a board-certified psychiatrist, had been treating Moffett for years following the assault. Dr. Miller testified that she met with Moffett every few weeks and had seen her for more than thirty sessions. Dr. Miller was also working alongside Moffett's therapist, Mandy Brown, to ensure that they were providing her with the most comprehensive treatment. Dr. Miller explained that "if she comes to me and says, you know, I'm very anxious, we kind of look at medications to see what we can do. But with her and the therapist, they would look at what kind of coping skills that she could possibly use to help overcome the anxiety." Additionally, Dr. Miller had connected with Moffett's general practitioner, Dr. Smith, to get a good understanding of Moffett's baseline level of behavior so that she could determine whether Moffett was improving.

¶23. Dr. Koestler, on the other hand, is not a board-certified psychiatrist. She is a consulting psychologist chosen by the City of Verona to perform an independent medical

13

evaluation on Moffett. Dr. Koestler saw Moffett once for an hour-long session, where she attributed Moffett's symptoms to "a long history of what appears to be chronic somatic preoccupation and well-documented anxiety depression." She concluded that Moffett had reached MMI and that "no further treatment [was] recommended." Then only a few lines down in the report, she concluded that "[Moffett] continue in psychiatric treatment given the severity and chronic nature of her symptoms." Both Dr. Miller and Dr. Webb disagreed with these findings. Dr. Miller asserted that Dr. Koestler's conclusion was not backed by evidence in Moffett's medical records and that her recommendation of no treatment constituted "malpractice."

¶24. Dr. Webb is a board-certified psychiatrist; however, he was not seeing Moffett on a consistent basis like Dr. Miller. During his deposition, Dr. Webb even admitted that "Dr. Miller knows [Moffett] better." Dr. Webb saw Moffett twice to perform independent medical evaluations. In the first evaluation, he noted many of the same symptoms and issues that Dr. Miller had identified, and he also diagnosed Moffett with PTSD. He attributed the PTSD to the assault. Dr. Webb had also pre-determined that Moffett was going to reach MMI by August 2020. However, Dr. Miller testified that "we can't really say . . . a date when we expect things to start to improve or when we think that they will improve and how long this will go on."

¶25. During the second evaluation, Dr. Webb completely switched gears. He attributed her PTSD symptoms to problems she was having with Chief Long and the Verona Police Department instead of the near-death assault. He opined, "[W]hile she still presently has

14

symptoms of nightmares and fear, this has more to do with the Chief and the Verona Police Department than with the attack. The Chief seems to be the central figure and the central traumatic situation for Ms. Moffett." He also made note of very minor changes in Moffett's behavior. He said that Moffett was "having nightmares 2-3 times a week."[6] He found that "[s]he does not look down nearly as much in this interview as she did in the last interview. While she does cry a little bit in this interview, it is a lot less than the last interview." Finally, he noted that "[h]er medicines are the same as when I saw her a year ago, with only a slight adjustment in her Seroquel dosage." He took these changes into consideration and somehow concluded that Moffett had reached MMI, but he found that her "baseline consists of multiple psychiatric symptoms." Less than a year before Dr. Webb determined that Moffett had reached MMI, Dr. Miller testified, "[S]till including up to her very last visit, which was September 5th of 2019, [Moffett] still had significant symptoms of PTSD. . . . She's a long way away from what we would consider maximum medical improvement and return to previous level of functioning." Dr. Miller considered her progress "very poor" and noted that she had regressed. Dr. Miller also noted that she had tried different medications but had not found one that had improved her symptoms, and they needed to continue looking for a medication that could help her improve.

¶26. The dissent focuses much attention on her previous diagnosis of major depressive

---

[6] In the first evaluation, he noted that Moffett was having nightmares three times a week. This is not a significant change from the previous year.

disorder and unspecified anxiety.[7]   However, Dr. Miller adamantly maintained that those

previous diagnoses are totally separate from her PTSD diagnosis and do not contribute to her

current condition:

> Depression and anxiety are both diagnoses that are completely separate
> diagnoses from post-traumatic stress disorder.  Post-traumatic stress disorder
> used to be a sub-category of an anxiety disorder. It is no longer being
> categorized as such [after] the last revision of the diagnostic and statistical
> manual that we use to formulate our diagnoses. It's been considered its own
> separate entity. . . . [T]he primary criterion that you have to meet is a traumatic
> event. So people can have depression, anxiety, you know, with stressors in
> their life – divorces, financial, whatever it may be – but people don't meet the
> criteria for PTSD based on just life stressors. It's typically a traumatic event
> that happens to them or that they have witnessed that then leads to certain
> symptoms that are categorized as post-traumatic stress disorder.

The dissent also attempts to attribute many of her issues to her ongoing lawsuits.  While the

legal proceedings may have caused stress, they were not the reason or direct cause of her

PTSD.  Dr. Webb admitted during his deposition that the litigation was not causing her

PTSD, but it was "keep[ing] a wound open."  Dr. Miller also made clear that the litigation

was not contributing to her diagnosis.  She clarified that constantly having to discuss the

assault and relive the details throughout the litigation was the problem because it was causing

her to have flashbacks of the assault.  During her deposition, Dr. Miller testified:

> And the same thing with this lawsuit against the City; yes, it's been very
> stressful for her, its been very distressing to deal with, but these are not the
> things she has intrusive thoughts about. These are not the things she has
> nightmares about. These are not why she's so hypervigilant and watches her
> back all the time. She's not scared that, you know, a coworker or a police
> officer that she has conflict with is going to come kill her on the street.

---

[7] Dr. Miller acknowledged that these diagnoses were made by general practitioners, not by trained board-certified psychiatrists.

Furthermore, Dr. Miller clarified that the belief that the chief set her up for the assault is part of the same transaction as the assault and plays a part in her mental trauma:

> Q. [W]hat about the fact that she thinks the chief set her up and that the chief is trying to kill her? Were those not traumatic events if she thinks that's true?
>
> A. Well, but the traumatic event would be the assault that he set her up for. Not the fact that he set her up, but that he set her up for this assault.
>
> Q. Was she not focused, though, on the fact that she thinks she was set up and that he's trying to get her killed?
>
> A. I mean that's part of the assault[.]
>
> . . . .
>
> Q. Did she ever separate it out and say that the chief was trying to kill her from another event, or was it always related to this February 27, 2017, event where she was saying the chief set me up with this event or with this incident?
>
> A. Per the way I understand what she's telling me, it's always been related to the assault.

The traumatic event that caused Moffett's PTSD was getting assaulted nearly to death; *part of that trauma was her belief that she was sent to (or set up for) the assault* by Chief Long, who was supposed to be Moffett's backup. These events were all part of the same near-death experience during which the perpetrator brutally beat Moffett and tried to take her gun, putting Moffett in fear for her life. Causal connection established. When a claimant seeks compensation benefits for mental injuries, the claimant must prove a causal connection between the employment and the injury by clear and convincing evidence. *See Delphi Packard Elec. Sys. v. Brown*, 6 So. 3d 1091, 1094 (¶10) (Miss. Ct. App. 2008) (affirming the Commission's decision that claimant sustained psychological or mental injuries flowing from

17

his physical injuries).

¶27.    Perhaps the greatest evidentiary support for the Commission's decision is Dr. Miller's warning about Moffett avoiding confrontational work. Dr. Miller testified that it was not safe for Moffett to return to work as a school resource officer or any job that involves confrontations. Furthermore, Dr. Miller opined:

> She has especially had a hard time dealing with conflicts and confrontations at her job. Her primary responsibility is to be there to assist when altercations break out between students or between student and teacher. It is her job to intervene and diffuse the situation. She does not handle this part of her job well at all. I have seen her in my office on a day she had to handle such situations, and she is visibly shaken by the event. Given her tendency to overreact to these types of situations now, I am concerned about the way she will handle these situations.

Dr. Webb also initially reported that Moffett would only be able to work in "low stress and safe environment[s]" because "[s]he would be a danger to others and herself with her Posttraumatic Stress Disorder." However, in his follow-up report, Dr. Webb stated that Moffett "should go back to working as a school resource officer in school or other jobs along that line." It is likely that the Commission found this to not be credible when they considered and weighed other evidence in the record. Moffett's medical reports reveal that while working as a school resource officer at Lee County Elementary School, Moffett put a pistol to a child's head when trying to break up a fight. On one occasion, there was a shooting near the school and Moffett left the students. On another occasion, she had a flashback of the assault when she was trying to recover a pistol after a man dropped it in the street while fleeing from police. There are several mentions of Moffett isolating herself in her office, which caused problems with her administration. Dr. Miller noted:

18

> She was verbally reprimanded several times during the 2017/2018 school year for staying in her office too much. [Moffett] basically just tries to get through her work day by isolating herself in her office. It makes her very anxious just to walk the hallways and interact with teachers and students. The students want to hug her, but she doesn't want to be touched.

She has also expressed to Dr. Miller her wishes to harm her co-workers, and Dr. Miller noted Moffett's "extreme anger responses to situations both at work and in public places." Dr. Webb testified that he had reviewed all her medical records, which detailed all these occurrences, yet he still determined that it was safe for her to return to jobs involving confrontations. In the final order, the Commission noted:

> The majority of her work history includes confrontational and potentially combative duty: military service, police duty, school resource officer, and process server. We find based on the evidence presented and the credible testimony of the Claimant that it is highly unlikely that the Claimant can return to these former positions because of the potential for harm or a combative experience in these fields of work. A review of her medical records demonstrates instances where the Claimant's PTSD became aggravated due to work within these fields.

"Moffett's condition was not physical but mental" and unlike recovery from a physical injury, healing for mental health trauma is more successful if one is not subjected to certain "triggers" that could realistically result in an injury to themselves and/or others.

¶28. In this case, Dr. Webb's medical opinion did not account for the triggers inevitable in Moffett's line of work. To suggest that she could go back to work (just not at the City of Verona) disregarded the nature of her work history and the danger that could result from sending her to jobs where confrontation is inevitable. Dr. Miller and the Commission took that into consideration based on substantial evidence and made a decision commensurate with that evidence and what they believed was Moffett's current state of being. In the order,

the Commission held

> We find based on the evidence presented and the credible testimony of the Claimant that it is highly unlikely that the Claimant can return to these former positions because of the potential for harm or a combative experience in these fields of work. A review of her medical records demonstrates instances where the Claimant's PTSD became aggravated due to work within these fields. In one instance, the Claimant recovered a handgun from the street in order for the gun to not end up in the wrong hands. Dr. Smith, Claimant's treating primary care physician, noted that the Claimant had flashbacks and her mental condition deteriorated. Further, Dr. Miller advised the Claimant to take a leave of absence as a resource officer because she was not progressing in her recovery due to her position within the school district.

¶29. It is clear that the Commission reviewed Moffett's medical record and history. What the dissent does not recognize—but our Court has—is that the Commission does not have to accept Dr. Webb's opinion. *See Weathersby v. Miss. Baptist Health Sys., Inc.*, 195 So. 3d at 882 (¶21). The Commission did, however, accept Dr. Miller's opinion:

> Dr. Chandra Miller, psychiatrist, is the Claimant's treating physician for her post-injury mental condition. Dr. Miller diagnosed the Claimant with post-traumatic stress disorder (PTSD) and directly relates this diagnosis to the Claimant's work-related injury. Dr. Miller opined that the Claimant's pre-existing depression and/or anxiety are unrelated to her PTSD diagnosis as these are completely separate diagnoses. Dr. Miller treated the Claimant for several years and noted significant mental injury[.]

Dr. Miller remained steadfast in her diagnosis and its root cause, she gave detailed medical findings regarding her diagnosis and symptomology, and she had been treating Moffett for years while working with her other doctors to try and get her back to her baseline. The Commission simply found her methodology and detailed medical findings to be credible.

¶30. This Court dealt with conflicting medical testimony in *Howard Industries Inc. v. Sicily Wheat*, 295 So. 3d 592 (Miss. Ct. App. 2020). In that case, Sicily Wheat, a coil helper at

20

Howard Industries, injured her back while lifting a basket of coil. *Id*. at 595 (¶2). Three doctors examined Wheat and offered testimony regarding their medical findings. *Id*. at (¶4). After determining that Wheat had reached MMI, Dr. Patterson concluded that Wheat could return to a light-level work duty and he assigned her a seven percent whole-person impairment rating. *Id*. at (¶5). Dr. Vohra found that Wheat could return to medium-level work duty and he assigned her a two percent whole-person impairment rating. *Id*. at (¶6). Dr. Blount didn't assign any limitations or work restrictions and he also assigned her a two percent whole-person impairment rating. *Id*. at 595-96 (¶8). Wheat eventually returned to work at Howard Industries and received a higher hourly wage, however, she needed additional personnel to assist her with her job. *Id*. at 596 (¶10). The AJ concluded that Wheat had not suffered a loss of wage-earning capacity because she was employed in her pre-injury position for higher wages. *Id*. at 595 (¶8). The Commission reversed because it "found the opinions of Dr. Patterson and Dr. Vohra to be 'more probative' than that of Dr. Blount and determined that the work injury had 'decreased her ability to perform work on the open labor market.'" This Court affirmed, holding that "the Commission was within its scope to weigh the differing opinions of Dr. Patterson and Dr. Vohra more heavily than that of Dr. Blount." *Id*. at 600 (¶30). The same should hold true in this case. Here, the Commission simply weighed the testimony of Dr. Miller, Dr. Webb, and Dr. Koestler and found Dr. Miller's testimony to be "more probative." *Id*. at 599 (¶28). The Commission was well within its discretion to do so as the fact-finder and substantial credible evidence in the record supported the decision. "A Commission decision that is supported by substantial

21

evidence may not be overturned even if, were this Court acting as the fact-finder, we would have reached the opposite conclusion." *Lifestyle Furnishings*, 985 So. 2d at 358-59 (¶17) (citing *Vance v. Twin River Homes Inc.*, 641 So. 2d 1176, 1180 (Miss. 1994)).

## CONCLUSION

¶31. After a thorough review of the record, we find that there was substantial credible evidence to support the Commission's decision. The Commission found Dr. Miller more credible than the other doctors, and it chose to assign more weight to her medical findings. Taking Dr. Miller's medical findings, Moffett's testimony, and other evidence into consideration, the Commission determined that Moffett suffered an 80% loss of wage-earning capacity. As the ultimate fact-finder, the Commission was completely within its discretion to do so, and we are not at liberty to substitute our judgment for that of the Commission. Accordingly, we affirm the Commission's decision.

¶32. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD AND LAWRENCE, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY SMITH AND EMFINGER, JJ.**

**WILSON, P.J., DISSENTING:**

¶33. Stephanie Moffett was assaulted while working as a police officer for the City of Verona. Moffett filed a workers' compensation claim, alleging she had suffered physical and mental injuries, including depression, anxiety, and post-traumatic stress disorder (PTSD) as

a result of the assault. The City[8] admitted that Moffett had sustained a compensable physical injury but denied she had sustained any compensable mental injury or loss of wage-earning capacity. The Workers' Compensation Commission found that Moffett had reached maximum medical improvement (MMI), that she had no permanent physical restrictions, and that her only permanent physical impairment was a 2% impairment to her left arm. The Commission found, and the City does not contest, that Moffett is entitled to permanent partial disability benefits for the 2% impairment to her left arm. The Commission also awarded Moffett nearly three and a half years of temporary total disability benefits, which the City does not challenge on appeal. Finally, the Commission found that Moffett's work injury had resulted in "a psychiatric condition which may have included PTSD and/or depression and anxiety." The Commission awarded Moffett permanent partial disability benefits for her psychiatric condition, finding it had resulted in an 80% loss of wage-earning capacity.

¶34. I would reverse and render the Commission's award of permanent partial disability benefits based on a work-related mental injury. As explained below, Moffett failed to present substantial evidence that any permanent disability or loss of wage-earning capacity persisted at the point she reached MMI. Therefore, I respectfully dissent.

### *Facts and Procedural History*

¶35. The Verona Police Department (VPD) hired Moffett as a patrol officer in 2008. Moffett alleges that the interim police chief at the time, J.B. Long, sexually harassed her after she was hired. Moffett filed a charge of discrimination with the Equal Employment

___

[8] The City's insurance carrier is the Mississippi Municipal Workers' Compensation Group. I refer to the City and carrier collectively as the City.

23

Opportunity Commission (EEOC), but she withdrew the charge after the City hired a new police chief.

¶36.	In 2015, Long again became police chief, and Moffett alleges that he resumed sexually harassing her. In January 2016, Moffett submitted a written grievance to the City's Board of Aldermen. The Board considered Moffett's grievance at a meeting in March 2016. "Despite being given an opportunity to present witnesses or other evidence, [Moffett], who was represented by counsel at the meeting, did not do so. Long presented witnesses to testify in his favor. According to the minutes from the meeting, [Moffett's] allegations were dismissed 'due to lack of evidence.'" *Goree v. City of Verona*, No. 1:17-CV-93-SA-DAS, 2021 WL 4449985, at *3 (N.D. Miss. Sept. 28, 2021), *aff'd*, No. 21-60911, 2022 WL 3647279 (5th Cir. Aug. 24, 2022).[9] In September 2016, Moffett filed another EEOC charge against the City, again alleging harassment by Long. The EEOC apparently issued a right to sue letter, and Moffett thereafter sued the City and Long in federal court.[10]

¶37.	On February 27, 2017, while working as a police officer for the City, Moffett

---

[9] The federal case is captioned *Goree v. City of Verona* because Moffett's surname was Goree prior to her 2016 divorce.

[10] Moffett filed suit against the City and Long in June 2017. Her complaint asserted gender discrimination and retaliation claims against the City under Title VII and equal protection and retaliation claims against Long under 42 U.S.C. § 1983. Moffett alleged that after she filed a grievance against Long, he retaliated against her by cutting her hours, refusing to allow her to work overtime, requiring her to take non-random drug tests, forcing her to drive an unsafe patrol car, and refusing to assist her during the assault at issue in this workers' compensation case. *See Goree*, 2022 WL 3647279, at *1. Prior to trial, the district court granted partial summary judgment in favor of the City and Long. But the court allowed Moffett to proceed to trial on her Title VII hostile work environment claim against the City for post-July 2015 conduct and on her section 1983 hostile work environment claim against Long. The jury found for the City and Long on all claims. *See id.* at *2.

responded to a domestic violence call from an apartment. At the apartment, Moffett encountered Sylvester Sikes violently attacking his girlfriend. When Sikes saw Moffett, "he threw down some crack [cocaine] and said that he had been smoking crack with Tupac all day." Sikes had a history of mental illness, and Moffett had encountered him previously in her capacity as a police officer. When Moffett intervened, Sikes attempted to take Moffett's gun from her, but he was unsuccessful. Moffett and Sikes fought "for approximately eleven minutes," and Sikes "kicked [Moffett] in [her] head and neck and . . . beat [her] pretty bad." Additional officers eventually arrived and intervened. After the paramedics checked on Moffett, she drove herself to the hospital.

¶38.    In April 2017, Moffett filed a petition to controvert with the Workers' Compensation Commission, alleging injuries to her right wrist, hands, fingers, left arm, neck, shoulders, back, and jaw, as well as a concussion. The City's answer admitted that Moffett had sustained a compensable injury. In March 2018, Moffett filed an amended petition to controvert that additionally alleged PTSD, depression, and anxiety. The City's answer to the amended petition denied that Moffett had sustained a compensable mental injury.

¶39.    Following the February 27, 2017 assault, multiple doctors treated Moffett for injuries to her right wrist, fingers, hands, and left arm. The Commission ultimately found that Moffett had reached MMI with respect to her physical injuries, that she had no permanent physical restrictions, and that her only permanent physical impairment was a 2% impairment to her left arm. The City does not challenge these findings on appeal.

¶40.    In addition to her employment with the VPD, Moffett had worked since 2011 as an

25

armed school resource officer for the Lee County School District and Lee County Sheriff's Department. In her March 2018 deposition, Moffett testified that although she had not returned to work for the City, she had resumed her job as a school resource officer. At that time, Moffett was also working as a process server. However, Moffett subsequently stopped working as a school resource officer and process server on the advice of her psychiatrist, Dr. Chanda Miller, whose testimony is discussed *infra*.

¶41. This appeal focuses on the evidence of Moffett's alleged *mental* injuries. For several years prior to the assault at issue in this case, Moffett had been treated for anxiety and depression. In 2008, Kenny Cook, a board certified nurse practitioner, diagnosed Moffett with anxiety. In 2010, Cook diagnosed Moffett with anxiety and depression and prescribed Xanax. In 2012, Moffett reported to Dr. Donald Smith at the Okolona Family Clinic that she was experiencing anxiety and depression. In 2016, Dr. Smith diagnosed Moffett with major depressive disorder and noted that she was taking Trazodone.

¶42. After the assault at issue in this case, Moffett began counseling sessions with Mandy Brown, a licensed professional counselor. Brown referred Moffett to Dr. Chanda Miller, a psychiatrist. In May 2017, Dr. Miller diagnosed Moffett with PTSD, which Dr. Miller attributed to the assault. Dr. Miller believed that Moffett's preexisting depression and anxiety were unrelated to her PTSD diagnosis.

¶43. In September 2019, Dr. Miller testified in a deposition that Moffett had not yet reached MMI and was still temporarily and totally disabled. Dr. Miller "believe[d] that [Moffett] would at some point be able to return to an employment." Dr. Miller also

"believe[d]" that one of "the biggest factors" in Moffett's recovery was "getting some of this litigation off of her" because the litigation had caused her "significant" stress. Dr. Miller thought it would "be very hard for [Moffett] to improve and move forward with [the litigation] on the table." Dr. Miller testified that the "goal of [Moffett's] medication management and therapy [was] to be able to move forward from the trauma and . . . get back to baseline." Dr. Miller testified that Moffett's recovery would take "a minimum of a year," but Dr. Miller could not state with certainty when Moffett would reach MMI.

¶44. At the July 2021 evidentiary hearing before an administrative judge (AJ), Moffett introduced limited records regarding her treatment by Dr. Miller subsequent to Dr. Miller's deposition. Those records show that from February to April 2020, Moffett's federal suit against the City continued to cause her significant anxiety. Moffett told Dr. Miller that her attorneys had tried to settle the case without her knowledge, that she distrusted her attorneys and thought they were trying to cheat her, that she had been unable to find a new attorney to take her case, and that she was trying to get assistance from the ACLU or NAACP.[11]

¶45. In June 2018, Moffett saw Dr. Angela Koestler, a psychologist, for an Employer's Medical Examination (EME). Dr. Koestler reviewed Moffett's medical records and

---

[11] Attorneys on both sides of the federal case believed they had agreed to a global settlement of both the federal case and this workers' compensation case. *Goree v. City of Verona*, No. 1:17-CV-93, 2020 WL 13111160, at *1 (N.D. Miss. Aug. 10, 2020), *report and recommendation adopted*, 2020 WL 13111161 (N.D. Miss. Sept. 25, 2020). A federal magistrate judge found that the settlement was not finalized, at least in part, because Moffett "did not fully understand at least some of the details of the agreement." *Goree*, 2020 WL 13111160, at *2. The City and Long filed a motion to enforce the settlement, but the district court denied the motion, and litigation in the federal case resumed and eventually proceeded to trial. *Goree*, 2020 WL 13111161, at *1-2; *Goree*, 2022 WL 3647279, at *2.

performed several psychological tests. Moffett denied any history of anxiety or depression and stated that she began experiencing anxiety and depression and was diagnosed with PTSD after the assault. In her report, Dr. Koestler noted that "[t]here was some evidence of possible symptom exaggeration" and that Moffett's medical records showed that she did have a preexisting history of anxiety and depression. Dr. Koestler concluded that Moffett's preexisting psychiatric symptoms "were possibly exacerbated by the 2017 work-related assault; however, they are now considered at her preexisting symptom baseline." Dr. Koestler further concluded that Moffett was at MMI with no psychiatric restrictions or need for additional psychiatric treatment related to the assault.

¶46. In light of the conflicting opinions of Dr. Miller and Dr. Koestler, the Commission appointed Dr. Mark Webb to perform an Independent Medical Examination (IME). Dr. Webb reviewed Moffett's medical records, evaluated Moffett and prepared an IME report in August 2019, testified via deposition in June 2020, and finally re-interviewed Moffett and prepared an updated IME report in August 2020. In his August 2019 IME report, Dr. Webb noted that Moffett had a preexisting history of anxiety and depression, but he concluded that she was suffering from PTSD as a result of the assault. Dr. Webb believed that Moffett should continue treatment with Dr. Miller for an additional twelve months, at which point she would be more than three years removed from the assault "and should be at [MMI]." Dr. Webb stated that Moffett was not yet ready to return to "her former occupation," but the issue should be revisited once she reached MMI. Dr. Webb opined that Moffett was capable of working "in a low stress and safe environment as she [was] doing." Dr. Webb's June 2020

28

deposition testimony was consistent with his initial IME report. He confirmed that Moffett should reach MMI soon, at which point her condition should be reevaluated.

¶47. Dr. Webb re-interviewed Moffett in August 2020 and provided an updated IME report. Dr. Webb found that Moffett had improved significantly since he evaluated her a year earlier and had reached MMI and returned to her pre-injury "baseline." Dr. Webb noted that "Moffett [was] most upset about [Chief Long] and what [Long allegedly] had done to her."[12] Dr. Webb concluded with the following summary:

> [I]t is quite obvious that Ms. Moffett was having significant mental health complaints prior to the attack at work on February 27, 2017. These issues with [Long] and the [VPD] were traumatic and longstanding. While she didn't have the full complement of symptoms of [PTSD], . . . the attack . . . appeared to push her over the edge. We are now several years into excellent treatment by Dr. Miller and [Brown], and her medications have not been changed appreciably, which highlights that we are at [MMI]. . . . She has continued with the treatment . . . with [Brown] and with Dr. Miller, and she has improved. She is in better shape. ***She is now back to baseline but note that her baseline consists of multiple psychiatric symptoms.*** While she still presently has symptoms of nightmares and fear, this has more . . . to do with [Long] and the [VPD] than with the attack. [Long] seems to be the central figure and the central traumatic situation for Ms. Moffett.
>
> Ms. Moffett is at [MMI] as of August 13, 2020, as it relates to the February 27, 2017 work-related injury. She does have a Mental and Behavioral Disorder impairment of 20%. She would not be able to return to work ***at the [VPD]*** for multiple reasons but one of them would be the attack of February 27, 2017. ***The main reason, however, would be the alleged hostile environment consisting of sexual and gender harassment.***

---

[12] Moffett has alleged that Long somehow caused Sikes—who was mentally ill and high on cocaine—to assault her. Moffett has also alleged that Long plotted to have her killed. Dr. Webb's and Dr. Miller's records indicate that Moffett told them that unnamed third persons made statements that support these allegations. However, no credible evidence in this record supports these allegations. Also, as noted above, Moffett's federal lawsuit resulted in a final judgment in favor of Long and the City on all claims.

29

. . . .

Ms. Moffett could return to some form of work, however, but just not back at the [VPD].  She should go back to working as a resource officer in school or other jobs along that line. . . .

. . . .

In conclusion, Ms. Moffett is at [MMI] as it relates to her work-related psychiatric illness regarding the February 27, 2017 incident.  ***Even though she is at MMI, she does still have psychiatric illnesses which were ongoing and pre-existing her work injury.***  She could benefit from treatment for those illnesses and should continue to see [Brown] and Dr. Miller; ***however, any future mental health treatment is not related to the February 27, 2017 injury***.

(Emphasis added).

¶48.    Prior to the evidentiary hearing in this case, Moffett cycled through multiple attorneys, all withdrawing due to conflicts with Moffett.  Her last attorneys filed a motion to withdraw in May 2021 because, inter alia, Moffett refused to listen to their advice, sent a lengthy pro se demand letter to the carrier against their advice, demanded that they assert "numerous irrelevant" and "ethically questionable" claims, recorded attorney-client conversations without their "knowledge or permission," shared the recorded conversations with others, and stated that "she would not attend" her evidentiary hearing due to a "family reunion," which she thought "would force [the AJ] to continue" the case.  The City did not oppose the attorneys' request to withdraw but asked the AJ not to continue the evidentiary hearing, which was set for July 7, 2021, because it had already been continued multiple times—most recently because Moffett had fired her prior attorney for a second time.  The AJ granted Moffett's attorneys' motion to withdraw on June 2, 2021.  Two weeks later, Moffett filed a

pro se request for a continuance to allow her to find a new attorney. On June 25, 2021, the AJ denied Moffett's request, stating that the hearing had already "been continued multiple times" and would proceed as scheduled. The AJ noted that Moffett had been afforded more than thirty days from her attorney's withdrawal to obtain new counsel.

¶49. Moffett represented herself at the evidentiary hearing. Exhibits pre-filed by one of Moffett's former attorneys and the City were admitted, including Moffett's medical records, the EME and IME reports, and the depositions of Moffett, Dr. Miller, and Dr. Webb. Moffett was the only witness to testify at the hearing.

¶50. In March 2022, the AJ entered an order finding that Moffett was at MMI with regard to her physical injuries, that the only physical impairment rating she had been assigned was a 2% rating to her left arm, and that she had no permanent physical restrictions. The AJ also awarded Moffett temporary total disability benefits from February 27, 2017, through August 13, 2020,[13] which the City does not contest on appeal. In addition, the AJ found that Moffett experienced "a psychiatric condition which may have included PTSD and/or depression and an anxiety disorder as a result of her work injury." The AJ found that Moffett's psychiatric condition rendered her permanently partially disabled and resulted in a 50% loss of wage-earning capacity. Therefore, the AJ awarded Moffett permanent partial disability benefits equal to 50% of two-thirds of her average weekly wage. Miss. Code Ann. § 71-3-17(c)(25) (Rev. 2021). The AJ also ruled that Moffett was "entitled to penalties and interest on any

---

[13] Moffett's average weekly wage (AWW) was $533.75. She was entitled to temporary total disability benefits equal to two-thirds of her AWW per week ($355.83) for the temporary total disability period (approximately 180 weeks). Miss. Code Ann. § 71-3-17(b).

past due disability payments." The City and Moffett both appealed to the full Commission.

¶51. In September 2022, the Commission affirmed in part and amended in part the order of the AJ. The Commission affirmed the AJ's findings that Moffett had reached MMI with regard to her physical injuries, that Moffett's only permanent physical impairment was a 2% impairment to her left arm, and that Moffett had no permanent physical restrictions. The Commission also affirmed the AJ's award of temporary total disability benefits[14] and ruling that Moffett was entitled to penalties and interest on any past due benefits. In addition, the Commission affirmed the AJ's finding that Moffett was permanently partially disabled because her injury had resulted in "a psychiatric condition which may have included PTSD and/or depression and an anxiety disorder." However, the Commission amended the AJ's order to find that Moffett's work-related mental injury had caused an 80% loss of wage-earning capacity. The Commission also amended the AJ's order to clarify that Moffett was entitled to permanent partial disability benefits for the 2% impairment to her left arm.[15]

¶52. The City appealed the Commission's order. The City argues that Moffett failed to present substantial evidence that any work-related mental injury resulted in a permanent disability or loss of wage-earning capacity. The City contends that Moffett is entitled to permanent partial disability benefits only for a 2% impairment to her left arm.

***Analysis***

---

[14] As noted above, the City does not contest this award on appeal.

[15] *See Gen. Elec. Co. v. McKinnon*, 507 So. 2d 363, 366-67 (Miss. 1987) (holding that an injured worker may recover for both an injury to a scheduled member and a separate injury to her body as a whole).

¶53. "The standard of review in workers' compensation cases is limited. The substantial evidence test is used." *Weatherspoon v. Croft Metals Inc.*, 853 So. 2d 776, 778 (¶6) (Miss. 2003). This Court will reverse a decision of the Commission "only for an error of law or an unsupported finding of fact." *Id.* "Reversal is proper only when a Commission order is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law." *Id.* However, we will reverse if the Commission's findings are "clearly erroneous and contrary to the overwhelming weight of the evidence." *Fought v. Stuart C. Irby Co.*, 523 So. 2d 314, 317 (Miss. 1988). The Commission's "[f]indings may be determined to be clearly erroneous, although there is some slight evidence to support them, if, on the entire record, the reviewing court is left with a firm and definite conviction that a mistake has been made by the Commission in its findings of fact." *S. Cent. Bell Tel. Co. v. Aden*, 474 So. 2d 584, 595 (Miss. 1985). We review issues of law de novo. *Cook v. Home Depot*, 81 So. 3d 1041, 1045 (¶3) (Miss. 2012).

¶54. The Mississippi Supreme Court has explained that

> Mississippi Code Section 71-3-7 provides that "[c]ompensation shall be payable for disability or death of an employee from injury or occupational disease arising out of and in the course of employment, without regard to fault as to the cause of the injury or occupational disease." Section 71-3-3 defines "disability" as "incapacity *because of injury* to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings." In other words, to be due compensation under the Workers' Compensation statutes, the employee's work-related injury—and not some other cause—must affect the employee's capacity to "earn the wages which the employee was receiving at the time of injury in the same or other employment."

*Hudspeth Reg'l Ctr. v. Mitchell*, 202 So. 3d 609, 610 (¶6) (Miss. 2016) (footnotes omitted).

¶55.    "The claimant bears the burden of proving both an actual physical injury and loss of wage-earning capacity." *Duren v. Effex Mgmt. Sols. LLC*, 342 So. 3d 481, 489 (¶33) (Miss. Ct. App. 2022).  Specifically, "the claimant[] bears the burden of proving that [her] work injury resulted in a permanent disability causing him to suffer a loss of wage-earning capacity, and this disability must be supported by medical findings." *Id.* at 499 (¶85).  The claimant must meet her burden with "medical evidence properly admitted before the AJ and the Commission." *Id.* (quoting *Mabus v. Mueller Indus. Inc.*, 205 So. 3d 677, 683 (¶28) (Miss. Ct. App. 2016)).  "Unless common knowledge suffices, medical evidence must prove not only the existence of a disability but also its causal connection to employment." *Howard Indus. Inc. v. Robinson*, 846 So. 2d 245, 259 (¶49) (Miss. Ct. App. 2002).  "A workers' compensation claimant bears 'the general burden of proof to establish every essential element of her claim, *and it is not sufficient to leave the matter to surmise, conjecture or speculation*." *West v. Nichols Ctr.*, 369 So. 3d 110, 114 (¶21) (Miss. Ct. App. 2023) (quoting *Narkeeta Inc. v. McCoy*, 247 Miss. 65, 69, 153 So. 2d 798, 800 (1963)).

¶56.    In addition, "[t]o recover benefits for a mental injury suffered after a physical injury, a claimant must prove that the disabling mental injury 'was caused, contributed to, or aggravated by a work-related physical injury.'" *Daniels v. Peco Foods of Miss. Inc.*, 980 So. 2d 360, 363 (¶10) (Miss. Ct. App. 2008) (quoting *Kirk v. K-Mart Corp.*, 838 So. 2d 1007, 1010 (¶17) (Miss. Ct. App. 2003)).  Indeed, "when a claimant seeks compensation benefits for disability resulting from a mental or psychological injury, the claimant has the burden of proving by clear and convincing evidence the connection between the employment and the

34

injury." *Fought*, 523 So. 2d at 317.

¶57. "The [Workers' Compensation] Act categorizes disabilities by duration as either temporary or permanent . . . ." *Flowers v. Crown Cork & Seal USA Inc.*, 167 So. 3d 188, 191 (¶12) (Miss. 2014). "Temporary disability . . . has reference to the healing period following injury, until such time as the employee reaches [MMI]." *Id.* (ellipsis omitted) (quoting *Triangle Distrib. v. Russell*, 268 So. 2d 911, 912 (Miss. 1972)). After MMI is reached, "any lingering disability is considered permanent." *Id.* Therefore, to meet her burden of proof on her claim for permanent disability benefits, Moffett was obliged to show that her mental injury caused her to suffer a loss of wage-earning capacity *post-MMI*.

¶58. The record evidence relevant to Moffett's PTSD diagnosis, anxiety, and depression comes from four primary sources: (1) her pre-injury medical records; (2) Dr. Koestler's EME report; (3) Dr. Miller's deposition and records; and (4) Dr. Webb's deposition and IME reports. Moffett's pre-injury medical records show that for several years prior to her work injury, she had been treated for anxiety and depression. As Dr. Webb put it, "it is quite obvious that Ms. Moffett was having significant mental health complaints prior to the attack at work on February 27, 2017," and those issues "were traumatic and longstanding." These preexisting mental health issues establish a "baseline" against which we must evaluate Moffett's condition at MMI.

¶59. Next, after examining Moffett and reviewing her mental health history, Dr. Koestler concluded that although Moffett's preexisting depression and anxiety "were possibly exacerbated by the 2017 work-related assault" her condition had returned to her "preexisting

35

symptom baseline." Dr. Koestler concluded that Moffett was "at MMI" as of June 2019 and could return to work without restriction.

¶60.    Dr. Miller disagreed with Dr. Koestler's conclusions that Moffett was at MMI and had returned to "baseline" as of June 2019. In September 2019, Dr. Miller stated that Moffett had not reached MMI and was still temporarily and totally disabled. Dr. Miller also stated that the stress caused by Moffett's ongoing litigation with the City and Long was a significant obstacle to her progress. However, Dr. Miller testified that the "goal" of Moffett's treatment was "to be able to move forward from the trauma and . . . get back to baseline." In September 2019, Dr. Miller testified that Moffett's recovery would take "a minimum of a year," but she "believe[d] that [Moffett] would at some point be able to return to an employment." Prior to the evidentiary hearing, Moffett's then-attorney filed records related to Moffett's February, March, and April 2020 sessions with Dr. Miller. Those records are limited but show that Moffett's federal suit against the City and Long and difficulties with her attorneys continued to cause her significant stress.

¶61.    Dr. Miller's testimony and records are inherently limited in that they relate solely to Moffett's *pre-MMI* condition. Indeed, Dr. Miller's testimony predated MMI by nearly a year. At that time, Dr. Miller testified that the "goal" of Moffett's treatment was to "get back to baseline" and "return to an employment," but Moffett had not reached MMI. Accordingly, Dr. Miller's testimony and records do not speak to Moffett's post-MMI condition, her *permanent* restrictions, or her loss of wage-earning capacity, if any.

¶62.    Finally, Dr. Webb reviewed Moffett's medical records, evaluated Moffett and

36

prepared an IME report in August 2019, testified via deposition in June 2020, and finally re-interviewed Moffett and prepared an updated IME report in August 2020. Dr. Webb's initial report and testimony were consistent with Dr. Miller's opinions in several respects. Dr. Webb's August 2019 IME report noted that Moffett had a preexisting history of stress and anxiety, but he concluded that she was suffering from PTSD as a result of the assault. Dr. Webb believed that Moffett should continue treatment with Dr. Miller for an additional twelve months, at which point she "should be at [MMI]." Dr. Webb stated that Moffett was not yet ready to return to "her former occupation" but that the issue could be revisited once she reached MMI. In addition, Dr. Webb's June 2020 deposition testimony confirmed that Moffett should reach MMI soon, at which point her restrictions should be reevaluated.

¶63.   Thus, both Dr. Miller and Dr. Webb diagnosed Moffett with PTSD, which they attributed to her work injury. In addition, they both initially testified that Moffett had not *yet* reached MMI, and both stated that Moffett should receive additional treatment with a goal of progressing toward MMI. In August 2019, Dr. Webb stated that Moffett "should be at [MMI]" in about one year. And in September 2019, Dr. Miller stated it would be at least one year until Moffett reached MMI. Indeed, Dr. Miller agreed that Dr. Webb's opinion that Moffett should reach MMI around August 2020 was "not . . . out of the realm of possibility; [Dr. Miller] would just have to see where [Moffett] was at that point in time."

¶64.   When Dr. Webb re-interviewed Moffett in August 2020, he found that she had significantly improved. Dr. Webb concluded that Moffett had reached MMI and could and should return to work. Dr. Webb noted that by that point in time, "Moffett [was] most upset

37

about [Chief Long] and what [Long allegedly] had done to her." Indeed, Moffett believed that Long had somehow "made" Sikes assault Moffett on February 27, 2017.

¶65. As noted above, Dr. Webb concluded that it was "quite obvious that Ms. Moffett was having significant mental health complaints prior to the attack at work on February 27, 2017." Dr. Webb further stated that Moffett was "now back to baseline but note[d] that her baseline consist[ed] of multiple psychiatric symptoms." Dr. Webb noted that although Moffett still had some "nightmares and fears, [that] had more to do with [Long] and the [VPD] than with the attack." Long and his alleged harassment remained "the central figure and the central traumatic situation for Ms. Moffett." Dr. Webb recommended that Moffett not return to work at the VPD, but the "main reason" for his recommendation was Moffett's claim that she had been subjected to a hostile work environment and harassment at the VPD. Dr. Webb concluded that Moffett could and should return to other employment, including her prior job as a school resource officer, "just not back at the [VPD]." Dr. Webb emphasized that Moffett had reached MMI and returned to her pre-injury "baseline," which consisted of "psychiatric illnesses which were ongoing *and pre-existing her work injury*." (Emphasis added). Dr. Webb further stated that while Moffett should continue to receive mental health treatment, "*any future . . . treatment is not related to* [*her work*] *injury*." (Emphasis added).[16]

---

[16] Dr. Webb did not "completely switch[] gears" when he evaluated Moffett in 2020 and issued his final IME report. *Ante* at ¶25. As discussed above, in 2019, Dr. Webb—much like Dr. Miller—found that Moffett had not yet reached MMI and should continue her treatment with Dr. Miller. A year later, Dr. Webb found that Moffett had reached MMI and that her condition had improved significantly. There is no inconsistency in finding that a patient's condition has improved over the course of a year in response to

¶66. Thus, the only evidence in the record regarding Moffett's condition *at MMI* is Dr. Webb's IME report. And Dr. Webb concluded that while Moffett continued to experience persistent mental health issues, her remaining issues were *preexisting*, and she had returned to her pre-injury "baseline." Further, the *only* restriction Dr. Webb placed on Moffett was that she should not return to the VPD. The "main reason" for even that limited restriction was Moffett's preexisting issues with Long, not her work injury.

¶67. Nonetheless, the Commission found that "it is highly unlikely that [Moffett could] return to" any "police duty," including as a school resource officer, or even work as a "process server." The Commission found that Moffett could not return to such "positions because of the potential for harm or a combative experience in [those] fields of work." However, the evidence the Commission cited simply does not support a finding that Moffett is permanently incapable of performing such broad categories of jobs. The Commission's opinion cited "one instance" mentioned briefly in Dr. Smith's records when Moffett's "PTSD became aggravated due to work within these fields." On that occasion, while working as a school resource officer, Moffett recovered a gun that a suspect had dropped while fleeing from Tupelo police officers. Moffett told Dr. Smith that the incident caused her to vomit and have "flashbacks." However, the Commission's opinion failed to note that the incident occurred in May 2017—less than three months after Moffett's work injury and *more than three years before she reached MMI*. Standing alone, that incident has no probative value regarding Moffett's condition at MMI. Similarly, the Commission relied on Dr. Miller's

additional treatment. In contrast, the record contains *no evidence* of Dr. Miller's opinions regarding Moffett's condition at MMI or her permanent restrictions, if any.

39

advice that Moffett take a leave of absence from her position as a school resource officer, but that also occurred years before Moffett reached MMI.

¶68. Moffett could have called Dr. Miller to testify at the evidentiary hearing. Moffett also could have introduced updated records or an updated report from Dr. Miller. However, as noted above, Moffett represented herself at the hearing, and she did not call any witnesses other than herself. Nor did Moffett introduce any up-to-date medical evidence or reports. Dr. Miller might have provided additional evidence to support Moffett's claim, but it would be utterly speculative to guess what Dr. Miller might have said. The important point for purposes of this appeal is that the deposition, report, and records of Dr. Miller that were admitted do not support Moffett's claim of a permanent disability or loss of wage-earning capacity—they simply do not address those issues because they all significantly predate the point at which Moffett reached MMI. "[H]aving elected to proceed without an attorney, [Moffett was] bound by the same rules of practice and procedure as an attorney. Needless to say, it is sometimes that a person acts at [her] peril to proceed in this fashion." *Bullard v. Morris*, 547 So. 2d 789, 790 (Miss. 1989).

¶69. As discussed above, Moffett bore the burden of proving an "incapacity *because of injury* to earn the wages which [she] was receiving at the time of injury in the same or other employment." Miss. Code Ann. § 71-3-3 (Rev. 2021) (emphasis added). That is, she had to prove a loss of wage-earning capacity due to her "work-related injury—and not some other cause." *Hudspeth Reg'l Ctr.*, 202 So. 3d at 610 (¶6). She had to meet that burden with credible medical evidence properly admitted before the Commission. *Duren*, 342 So. 3d at

40

499 (¶85). And she had to show that her incapacity was *permanent*, i.e., that it persisted once she reached MMI. *Flowers*, 167 So. 3d at 191 (¶12). The only credible medical evidence regarding Moffett's condition at MMI is Dr. Webb's final report recommending that Moffett should return to work, "just not back at the [VPD]." The "main reason" for even that limited restriction was Moffett's preexisting mental health issues and her history of conflict with Chief Long—*not* her work injury. Beyond that, Dr. Webb concluded that Moffett had returned to her pre-injury "baseline," that she required no further mental health treatment related to her work injury, and that she was subject to no other restrictions. Put simply, Moffett failed to present substantial evidence of a permanent disability or loss of wage-earning capacity based on a mental injury. Accordingly, we should reverse and render the Commission's order awarding Moffett permanent partial disability benefits for such an injury.[17] I respectfully dissent.

**SMITH AND EMFINGER, JJ., JOIN THIS OPINION.**

---

[17] The City does not dispute that Moffett is entitled to an award of permanent partial disability benefits for the 2% functional impairment to her left arm. *See* Miss. Code Ann. § 71-3-17(c)(1).